[Sac. No. 1466.   Department Two.—May 7, 1907.]

## P. McELLIGOTT et al., Respondents, v. F. W. KROGH et al., Appellants.

MINING CLAIM—LODE LOCATION—BOUNDARIES—MONUMENTS ON LANDS NOT SUBJECT TO LOCATION.—Where the discovery and location of a mining claim were on lands subject to location within the boundaries laid out, the location is valid to the extent that the lands upon which the discovery was made and the location notice posted were within the marked boundaries and were public and unappropriated lands.   The fact that the corner monuments of the claim were placed on lands that were not open to location does not render the entire location void nor affect the validity of the location as to the lands within the exterior limits of the boundaries as so designated which are subject to location.

ID.—WIDTH OF CLAIM—EXCESSIVE LOCATION VALID AS TO LEGAL LIMITS. —The provision of the United States Revised Statutes declaring that the width of lode locations shall not ''exceed more than three hundred feet on each side of the middle of the vein at the surface,'' is equivalent to a declaration that the locator is entitled to have his right or title confirmed to all the surface of a lode claim which is within three hundred feet of either side of the apex of the vein at its surface, and which is included within the boundaries as marked by the locator.   If he includes within the boundaries more than the law permits, he is entitled nevertheless to hold to the limit which the law authorizes within the limits laid out, and only the territory embraced within his boundaries which is in excess of these limits is to be rejected.

ID.—MARKING BOUNDARIES—SIDE-LINE.—The locator of a lode location is only required in law to establish monuments at both ends of a side-line, and is not required to place intervening monuments thereon.

ID.—SIDE-LINE ORIGINALLY STRAIGHT—DRAWING IN SIDE-LINE—DETERMINATION OF TRUE SIDE-LINE.—Where one of the end monuments of the side-line of a lode location was originally marked at a place more than three hundred feet perpendicularly from the middle of the vein, and such side-line, as originally marked, was a straight line between such monument and another monument at the other end of the line, which was properly fixed within three hundred feet of the middle of the vein, the location will include all territory within three hundred feet of the middle of the vein and within the side-line as originally marked out.   The location is not limited to the territory included within a straight line run from the corner so properly fixed and a point on the opposite end-line distant three hundred feet from the middle of the vein.   And in determining the proper position of such side-line, in a controversy with a subsequent adjoining locator, the court should fix as many

intermediate corners thereon as were necessary to give the prior locators the territory which was within their original location and within the lateral rights defined by the statute.

Id.—Side-Line Need not Be Straight.—The side-lines of a lode claim as originally located are not required to be straight lines.

Id.—Lode Passing Beyond Side-Line—Extralateral Rights.—Where the vein in the course of its strike passes out of the side-line of the location, and so continues for some distance and then returns within the side-line, no extralateral rights are acquired as to the segment of the vein, the apex of which is outside of such side-line.

Id.—Want of Parallelism of End-Lines—Conflicting Findings—Appeal.—In a controversy involving the extralateral rights of the locators of a lode claim, the question whether the locators were or were not entitled to extralateral rights because the end-lines of their claim were not parallel will not be determined on appeal, when the findings are conflicting as to the fact of the parallelism of the end-lines.

APPEAL from a judgment of the Superior Court of Madera County.   W. M. Conley, Judge.

The facts are stated in the opinion of the court.

William E. Colby, and Chickering & Gregory, for Appellants.

G. G. Goucher, Newman Jones, and J. S. Larew, for Respondents.

LORIGAN, J.—This is an action in ejectment brought by plaintiffs, the owners of a mining claim known as the "Granite King," against the defendants, the owners of another mining claim called the "Live Oak." These claims join each other, the Live Oak lying to the east of the Granite King as originally staked on the ground; the latter overlapping the former to a considerable extent.

The Live Oak was located October 28, 1898; the Granite King on August 28, 1899, nearly a year later. Neither claim has been patented.

We incorporate herein a copy of the map used in evidence in the case and made part of the findings of the court, in order to illustrate the points made on this appeal.

The principal controversy, though not the only point in the case, is as to the correct boundary line between the two locations.   As the Live Oak location was the senior one, it

became necessary for the trial court, in order to determine the easterly boundary of the Granite King location, to determine first the proper legal position of the westerly side-line of the Live Oak location. This the court (referring now to lines, points, and letters indicated upon copy of map on opposite page) did as follows: It first determined and fixed the apex of the Live Oak vein trending as indicated on the map; it then found the original northwest corner, as established by the locators of the claim, to have been set at a point indicated on the map by the letter "O," being three hundred and twenty feet from the Live Oak vein, measured at right angles therefrom to said point "O"; the southwest corner, letter "A," it found to be well within the three-hundred-foot limit; it found the westerly line of the Live Oak location as originally staked by the locators to be a straight line connecting these original corners "O" and "A"; the court having so found these original corners as staked and the line connecting them, proceeded then to move the northwest corner in, fixed it at a point exactly three hundred feet from the apex of the Live Oak vein—letter "C"—and thus established a new legal northwest corner; the court then having established this new legal corner, found the legal westerly line of the Live Oak location, and, hence, the common line dividing the two locations, to be a straight line projected from this newly established three-hundred-foot corner "C" to the original southwest corner "A."

Having thus established the common boundary between the two claims, the court further found that the apex of a well-defined vein or ledge existed in the Granite King territory, which apex extended southerly, as indicated on the map, in a course from the "Mariposa Grant Line" at the letter "X," and very close to the established common boundary between the two claims, until it crossed "Turners Wire Fence Line" at a point "Y"; that this ledge dipped to the east at an angle of thirty-five degrees or forty degrees, and that within a few feet of its apex it passed underneath the surface of the Live Oak location.

In addition it was found that respondents were entitled to exercise extralateral rights on said vein on its dip underneath the Live Oak surface territory, and the court awarded them such rights in the judgment.

CLI Cal.—9

The court further found that all of the Granite King location lying to the west of the line designated on the map as "Turners Wire Fence Line" was not owned by respondents, but had been patented as agricultural land long prior to the date of the Granite King location; and that all of the Granite King location lying to the north of the line designated on the map as "Mariposa Grant Boundary Line" was not owned by respondents, but was part of said grant long prior to the date of making such Granite King location.

It was then found by the court that respondents were entitled to a triangular-shaped piece of territory bounded westerly by "Turners Wire Fence Line," northerly by the "Mariposa Grant Boundary Line," and easterly and southerly by the westerly side-line of the Live Oak location, as established by the court.

These are the principal facts as found by the court, and all that are necessary to be stated in order to consider the points presented on this appeal. As we have said, the main question on this appeal is as to the correctness of the action of the court in fixing the position of the common boundary between these two locations. But before approaching a consideration of that point, it is proper first to briefly consider another point urged by appellants, that the location of respondents— the location of the Granite King—was entirely void.

This contention of appellants is based on the fact that not one of the corners of the Granite King location was on ground that was vacant and open to appropriation; that every corner but one was placed on patented ground—on the Mariposa grant or Turner's patented agricultural land—and that one —the southeast corner—was placed within the limits of the Live Oak location.

It is true that the corners were placed, as appellants contend they were, but we do not perceive how this could affect the rights of respondents as to land which was within such boundaries and subject to location. The court found that the location of respondents was made in good faith, and in substantial compliance with the provisions of section 2324 of the Revised Statutes of the United States, [U. S. Comp. Stats. 1901, p. 1426]. The discovery was made by respondents upon lands subject to location, and their location notice posted thereon in a monument on the lode, and the boundaries were

traced upon the ground so that they could be readily found. We are referred to no authority which holds that the corner monuments of a location must be placed upon vacant or unappropriated lands subject to location, in order to constitute a valid location. The basis of the title or right to a mining claim is the discovery of the mineral-bearing vein. The posting of the location notice and marking of the boundaries is simply to give notice that a mining location by virtue of the discovery is claimed. Of course, if the discovery and location are made on lands belonging to another—either patented land or land taken under a previous valid location—the location is void. But that is not this case. Here the discovery and location were on lands subject to location within the boundaries laid out, and such location was valid to the extent that the lands upon which the discovery was made and the location notice posted were within the marked boundaries, and were public and unappropriated lands. This was the view the lower court took. In as far as the location conflicted with the Mariposa grant, the patented agricultural land of Turner, and the prior Live Oak location, the court rejected it and limited it in area to the triangular piece as represented on the map. Thereby the court rejecting the excess of land upon which the Granite King location could have no valid claim, held the location good as to the lands within the limits of the claim upon which a valid location was entitled to be made, and we make no question but what this was proper. (*Doe* v. *Tyler*, 73 Cal. 21, [14 Pac. 375] ; *West Granite Co.* v. *Granite Co.*, 7 Mont. 356, [17 Pac. 547] ; *Perigo* v. *Irwin,* 85 Fed. 904.)

Having disposed of this preliminary matter, we now approach the principal point in the case—the correctness of the location by the court of the common boundary line between the two locations.

As we have said, the Live Oak location being the senior one, it was necessary to establish its westerly boundary line in order to fix the easterly limits of the junior Granite King location, and this the court proceeded to do, as we have already shown, by first fixing the apex of the Live Oak lode, extended from its center lode monument along a straight line connecting such monument with its north-center lode monument. Having done this, the court then found that while the

southwest corner of the location "A" was inside the three-hundred-foot limits, measured from such lode, the original northwest corner "O," as placed by the locators, was three hundred and twenty feet from said lode—an excess of twenty feet over the authorized legal side-line limits; it then drew in this original corner, established it at "C," three hundred feet at right angles from the lode, and determined the westerly side-line of the Live Oak location to be a straight line measured from said new northwest corner "C" as fixed by the court to the original southwest corner—the line "C A."

Counsel for appellants claim that the court erred in so establishing the said westerly line of the Live Oak location, and that it should have established the westerly line of said location along the line "C B A," so as to include within the Live Oak location the triangular area embraced within those lines, and which was within three hundred feet of the lode, and we think this contention of appellants is correct.

The Revised Statutes of the United States (section 2320), [U. S. Comp. Stats. 1901, p. 1424], which declare the width of lode locations, provide that "no claim shall exceed more than three hundred feet on each side of the middle of the vein at the surface." This provision of the statute defining the lateral rights of a claim is equally a declaration that as to all the surface of a lode claim which is within three hundred feet of either side of the apex of the vein at its surface, and which is included within the boundaries as staked by the locator, he is entitled to have his right or title confirmed. A locator is not bound to absolute accuracy in laying out the boundaries of his claim, nor, as a penalty for having included within his side boundaries more than the statute allows as lateral rights, is he to lose any portion of the surface of the claim located, which is properly within these statutory limits. When he includes within his boundaries more than the law permits, he is entitled nevertheless to hold to the limit which the law authorizes within the limits laid out, and only the territory embraced within his boundaries which is in excess of these limits is to be rejected.

As said in Lindley on Mines (sec. 362), "It frequently happens that the locator marking his surface without the aid of chain or compass includes within his boundaries an area in excess of the statutory limit. The courts uniformly hold

that such a location, where it injures no one at the time it is made, and where it has been made in good faith, is void only to the extent of the excess.''

This is the general rule, and is declared as the rule obtaining in this state in *Thompson* v. *Spray,* 72 Cal. 528, 533, [14 Pac. 182], where it is said: ''The location is good for as much as the party is entitled to hold and void for the excess only.'' And in *Howeth* v. *Sullenger,* 113 Cal. 547, 552, [45 Pac. 841], where the declaration is made that ''It often happens that claims are located covering more than . . . 600 feet in width, . . . the location being void only as to the excess.'' Counsel for respondents cite nothing to the contrary.

Now, while the westerly boundary line of the Live Oak location, as originally laid out, included more surface territory than its locators were entitled to as lateral limits under the statute, still, within the rule announced, the lower court should have established the western boundary line of this location so as to include all territory within the limits staked which was within three hundred feet of the ledge, and only have rejected the excess. When the court established the westerly line of the Live Oak as a straight line between the points ''C'' and ''A,'' and rejected the triangular area between it and the line ''C B A,'' it rejected territory which was not only within the original boundaries as staked, but was within the statutory lateral limits authorized by law. There is no pretense that this triangular area was not within such limits. Measuring from any point along the middle of the vein, the line ''C B A'' was within three hundred. feet of the vein, and, hence, defined the statutory lateral limits to which the Live Oak location had a right to extend, and the lower court should have established it as the westerly boundary line of such location.

Respondents contend, because the locators of the Live Oak established their westerly line as a straight line between their improperly located northwest monument ''O'' and their properly located southwest monument ''A,'' that when the court established ''C'' as the proper northwest corner, the court was also required to establish the westerly boundary line as a straight line between ''C'' and ''A''; that in order to have had the court establish the western boundary line as ''C B A,'' the locator should have placed a monument at

"B." But the locators were only required in law to establish monuments at both ends of their westerly side-line, they were not required to place intervening monuments, and as they believed the northwest corner to be properly located by them three hundred feet from the lode, as the southwest corner was, there could be no occasion to place a monument at "B," because that point was within their westerly side-line, as they thought they had correctly established it by their monuments. Because they did not place a monument at an intervening point, when, under their mistaken belief as to the accuracy of the location of the end monuments, there could be no necessity for it, did not make them any less entitled to have a line established which would include territory along that line which was within three hundred feet of the lode and within the side-line as originally marked out. The right of the locators to have such territory included within a line established for that purpose between the northeast and southwest corners, did not depend upon the fact whether intervening monuments had been established by them, but because it was within three hundred feet of the lode and within the boundary line as originally fixed by their monuments placed at both ends.

Nor was the court required to fix the boundary line as a straight line between the northwest corner as established by the court, and the southwest corner, along the line "C A." There is no law which requires the side-lines as originally located to be straight lines. As is said by Lindley in his work on Mines (sec. 366), "As long as they keep within the statutory width, they may have angles and elbows. . . ."

Nor is there in this case any question relative to establishing a boundary line between two original corners where ordinarily a straight line would be drawn from one to the other. Here the court properly discarded one of the original corners—the northwest—"drew it in," as the mining phrase has it, and established it at a true distance of three hundred feet from the lode.

This corner had no existence till established by the court, and had nothing to do with fixing the original western boundary as the locators staked it. As they fixed this corner, the line therefrom embraced this triangular piece. If, as the law says, the locators are entitled to a surface area of a width

extending three hundred feet from the center of the vein, and their boundary line as originally extended between their monuments included this strip, we are at a loss to understand why the court could not have fixed corners so that lines drawn therefrom would include the territory within the statutory limits and which was embraced in the original location.  The power of the court to fix corners was not limited to fixing the proper northwest corner at ''C''—three hundred feet from the vein—and authority only left to draw a straight line from there to the original southwest corner.  The court had a right to fix as many corners as were necessary to give the locators of the Live Oak the territory which was within their original location and within the lateral rights defined by the statute. It had no right to fix a line which would exclude any territory within three hundred feet of the vein and within the lines of the original location.  When, therefore, the court drew in towards the lode the original northwest corner from where the locators had erroneously fixed it at ''O,'' and established that corner at ''C,'' it was the duty of the court to then also ascertain, with that corner so established, how much of the original Live Oak location was within the statutory limits, and to have fixed the westerly boundary accordingly.  As point ''B'' was within those limits and within the original boundary, it was the duty of the court to have established another corner at that point, and to make the line ''C B A'' the westerly side-line of the Live Oak location, instead of the straight line ''C A.''

And such a rule of adjustment as to a boundary line originally established by a senior locator in good faith, is not only just and proper, but it cannot be said, with any substantial merit, that it works an injury to a subsequent locator who establishes his boundary line within that of the senior location. Such junior locator, when he intrudes upon the side-line of a prior locator, knows from the monuments established by the latter where the original side-line of the senior location is, and where the vein of that location is, and he intrudes with his location at his peril.  He knows, even if one of the corners is outside the three-hundred-foot lode limit from the vein, that the surface territory within the side-line measured from its end monuments is all at least within three hundred feet of the vein. He knows that the law entitles the locator to a side-line

measured from the vein to not exceeding three hundred feet from it, and has no valid ground of complaint when the court gives a senior locator only the ground which he originally located and then extending no further from the lode than the statute said it might.

Now as to the only remaining point—the question of extralateral rights. It is insisted that respondents are entitled to none at all as to the segment of the vein "P I," which, it will be observed, under the view we take of the proper location of the westerly line of the Live Oak location, lies entirely within that location. This is no doubt true. As the apex of the vein between those points is outside the Granite King location, and entirely within that of the Live Oak, no extralateral rights in favor of respondents can apply to it. (Lindley on Mines, sec. 591.)

It is further insisted, however, that as to the other segments of the vein within the Granite King location, the respondents are entitled to no extralateral rights, because the end-lines of their claim are not parallel; that according to the map incorporated in the findings, the end-lines of the Granite King, instead of being parallel, converge in the direction of the dip of the vein.

And it is also insisted that if they are entitled to such rights, notwithstanding the end-lines of the claim are not parallel, but converging, that each segment of the vein from "X" to "I" and from "P" to "Y" must be treated as if it were a distinct and separate vein and apply to the northerly and southerly points of termination of each segment a perpendicular plane parallel to the respective northerly and southerly end-lines of the claim, giving extralateral rights to the respondents between such perpendicular planes, extended easterly in the direction of the dip of the vein until they converge.

Interesting as these questions may be, we do not think, under the findings as made, we can dispose of them, and it is possible that in this case we may never be called on to do so. It cannot be determined from the finding of the court as to these end-lines whether they are parallel or converging. The court makes the map, a copy of which we have inserted herein, a part of its findings in the case, and then, as to the end-lines of the Granite King location, finds "That the end-lines of said Granite King location are substantially parallel to each

other as they were originally laid out and located, as will appear from said map." Now, if the court had simply found that these end-lines were substantially parallel to each other, we would encounter no difficulty, because with the end-lines established as parallel no question could arise but that respondents were entitled to extralateral rights. But the court goes further and finds that they are substantially parallel as appears from said map. As the map is part of the findings, it must be taken into consideration in examining that finding. When we do so, we find that not only are the end-lines not substantially parallel as drawn on the map, but to a large degree are converging lines. The finding is, therefore, inconsistent and conflicting in its own terms, forming no basis for a solution of the question of extralateral rights, and makes it unnecessary to discuss them until it is definitely determined how the end-lines are located—whether parallel or converging. These lines will doubtless be accurately fixed on a new trial, and the finding of the court as to extralateral rights relative to them may be subject to no contention between the parties.

For the reasons given the judgment is reversed.

Henshaw, J., and McFarland, J., concurred.

Hearing in Bank denied.