[Civ. No. 1006.   Third Appellate District.—December 27, 1912.]

GEORGE MADEIRA and WESTERN CARBONIC ACID GAS COMPANY, Appellants, v. SONOMA MAGNESITE COMPANY, Respondent.

MINING CLAIMS—LOCATION—EXCESSIVE BOUNDARIES NOT VITIATING CLAIM—GOOD FAITH PRESUPPOSED.—The location of a mining claim is not rendered invalid merely because the locator includes within its boundaries more than the law permits. He is entitled to hold to the limit which the law authorizes, within the limits laid out, and only the territory embraced within his boundaries, which is in excess of such limits is to be rejected. This rule presupposes a location which injured no one at the time it was made and where it has been made in good faith.

ID.—EXCEPTION TO RULE—COURSES WIDELY SEPARATED—APPLICATION TO LODE IN QUESTION—LOSS OF NOTICE—SUBSEQUENT LOCATOR NOT BOUND AS TO EXCESS.—Where the locator relies upon the corners called for in his notice, and the courses called for are so widely separated and so remote as to justify a reasonable inference that they were not intended to apply to the lode in question, and the notice posted at the discovery point called for had disappeared, and the lode line was not distinctly marked, the excessive location should be deemed worthless for any purpose and not binding upon a subsequent locator.

ID.—DISTINCT MARKING OF LOCATION ON GROUND ESSENTIAL TO VALIDITY —MODE OF COMPLIANCE WITH STATUTE.—In order to render the location of a mining claim valid, under section 2324 of the Revised Statutes, the location must be distinctly marked upon the ground, so that its boundaries may be readily traced. In complying with this section any marking of the location on the ground by stakes, monuments, and written notices whereby its boundaries can be readily traced is sufficient; and if a third party intending to locate can readily ascertain from what has been done by the prior locator, the extent and boundaries of the claim so located, the object of the statute has been accomplished.

ID.—LOCATION OF APPELLANTS NOT DISTINCTLY MARKED PRIOR TO VALID ADVERSE LOCATION.—It cannot be held that the location of appellants was distinctly marked upon the ground prior to a valid adverse location by respondent's grantors, where the appellants only built monuments of a temporary character in an extremely broken and rough country, in which there were many other monuments of like character, with nothing to identify it as the location of the claim in question.

ID.—ERRORS OF LAW AS TO EVIDENCE—REVIEW UPON APPEAL—POINTS NOT SUFFICIENTLY PRESENTED.—A mere statement in appellant's brief as to errors of law in the admission of evidence, that the court erred in permitting certain questions to be answered, citing the page of the transcript, without any argument addressed to the court, is insufficient to present any point which the appellate court will consider.

APPEAL from a judgment of the Superior Court of Sonoma County. T. C. Denny, Judge.

The facts are stated in the opinion of the court.

Archibald Bernard, T. J. Butts, and J. P. O'Brien, for Appellants.

Grant H. Smith, and Rolfe L. Thompson, Edward Rice, and Marcus L. Samuels, for Respondent.

CHIPMAN, P. J.—This is an action to determine the conflicting claims to certain mineral land situated in Sonoma County. Plaintiffs claim by virtue of an alleged location made by plaintiff Madeira on April 12, 1905, called the Madeira Magnesite Mine. Defendant claims as grantee of certain alleged several locations, made by Arnold, Davis, and Woods, on September 14, 1905, embracing the land claimed by plaintiffs. The cause was tried by the court without a jury and defendant had findings and judgment in its favor.

Plaintiffs claim that the following findings are not supported by the evidence: "II. That said attempted location of said Madeira covered the ground described in paragraph 3 of the complaint herein and other ground. III. That the attempted location, viz., the Madeira Magnesite Mine, was not at the time of the attempted location thereof on or about April 12, 1905, or for more than a year thereafter, and long after the location on the same ground of the Cecilia, Flora, Marie, Seymour, and Cyril claims of defendant, distinctly marked on the ground, or marked at all, so that its boundaries could be readily traced."

Plaintiffs appeal from the judgment on transcript of all the proceedings in the case.

There are but two questions discussed in the briefs: 1. Assuming that Madeira made a location, was it void because of the excess of land included in it? and, 2. Was his location marked on the ground so that its boundaries could be readily traced?

Plaintiffs introduced a blue print map of the original Madeira location and as it was corrected on a relocation by Madeira in June, 1906. With the aid of this map and the testimony of plaintiffs' witness, Riley, who made the survey for plaintiffs, a fairly clear conception may be gained of what Madeira did, as shown by his testimony, in making his location in April, 1905. Austin Creek passes along a considerable portion of the southerly end line of the claim and meanders along its easterly boundary trending easterly at the northerly end line, as we understand the map; the points of the compass are not indicated. A trail ran along near this creek which was the means used by Madeira in passing from one part of the claim to another to locate his corners. As near as we can understand the process from his testimony, he

20 Cal. App.—46

made right angle offsets where he could and estimated the distances by stepping off the land. The country, he testified, is very rough and hilly and covered with a dense growth of chaparral along the east line impassable and generally difficult to penetrate except by cutting one's way through. The notice posted by him was as follows:

"Austin Creek Apr. 12th 1905
"Notice of Mineral Location

"'I the undersigned claim 1500 feet by 600 feet of this lode for mining purposes. Located in sec. 21 twp. 9 N. R. 11 W. adjoining the lands of Dr. Otner near Redslide, beginning at a tree and stake with monuments on South bank of East Austin Creek running 1500 feet in a Northwest and Southeast direction, with 300 feet on each side of lode with corner stakes and monuments on each corner. Lode crops high. Claimed for quicksilver, gold, silver or magnesite. George Madeira.''

His claim is in section 20 and not section 21, as stated in the notice. Madeira was familiar with the locality and with this particular ground and had made mineral locations before and claimed to know the requisites of the law governing the method of making them. He had some knowledge of surveying and civil engineering and carried a pocket compass on April 12, 1905. He testified: That he placed the first notice at "the point of discovery about 15 feet from the (south) end of the ledge on the south bank of the creek . . . on account of the creek raising in the winter, it would carry it away if it was on the ledge; . . . built a monument of rock around the base of the tree where the notice was posted, and that was the center of the ledge or lode." He then followed the trail leading up and down the creek to a point where "there was a pair of bars directly upon the trail." He picked up a board which he found at the base of a so-called juniper tree, nailed it to the tree and on it nailed a copy of his notice. He testified that any one going through these bars would see the notice. This was what he intended as his southwest corner. It was 276 feet away from where it should have been as shown in the corrected location. He found his southeast corner by following the trail. "I would step straight east and then offset and go east again to maintain as straight a line as it was possible to do." Reaching what he supposed was the southeast corner, he testified: "Posted a notice and built a monument of

earth there, there was no stone there, I had what I call my
geological pick and I dug up the earth and made a mound
of earth and put a picket from the fence in it and nailed
the notice on the fence." This was in fact 283 feet beyond
where it should have been. There was no evidence as to the
size of this monument nor was there any evidence that he
drove the picket into the ground. He then followed the trail
"on the right bank of the creek 1500" feet, measuring the
supposed distance by stepping, to what he intended as his
northeast corner, where, he testified, he "built a monument of
rocks and placed a stake in it immediately on the bank of the
creek." The size of the monument is not given nor does it
appear that the stake was driven in the ground nor how it
was placed among the rocks. This point was 145 feet north
and away from where it should have been. "I then went
directly west and stepped the ground the same way as I did
before, it is very difficult to get across the creeks and I had
to guess at the distance;  . . . then I came to the center, I
called it the center of the claim again, and there I built a
large stone monument in the gulch, in a little bit of a gulch
that came down there . . . and placed a stake in that, but
no notice on that end at all. From there I went west 300
feet from that stepping it up the hill through the brush, there
I found a small dry tree, I suppose three or four inches in
diameter, I broke the top off, and dug a mound of earth
again with a pick, there was some small boulders or rocks
lying around there and I gathered them up and piled them
around the base of the tree. That marked the northwest
corner of the claim." This was 364 feet north of where his
corner should have been on the west side of his claim, which,
according to his testimony, was practically impassable, and he
made no effort to get through it. Summing up the matter,
the court said, in its opinion printed in defendants' brief:
"Madeira intended to step off a claim 1500 feet by 600 feet,
but he really. marked out an irregular parallelogram over
2000 feet long on the west side; 1600 feet in the center; 1700
feet on the east side and probably 800 feet wide on the north
side." Madeira visited his claim twice prior to defendants'
location, once in April and once in July, and renewed some
of his notices, but placed no new ones and did nothing more
toward marking his claim; he also took away some specimens

of the rock but performed no work on the claim. He did nothing further, except in March, 1906, he attempted a survey but was prevented by the adverse locators, until in June, 1906, when he made a resurvey as shown by the map attached to the transcript. He was on his claim in the latter part of 1905, some time after defendants' location was made, and met Arnold, one of the contesting locators who were at work on the mine. He then expressed to Arnold the belief that he, Arnold, was on his, Madeira's claim, but nothing further occured then. He made no protest and offered no objection to the locators' possession.

Witness Bradley qualified as a surveyor and civil and mining engineer. He was employed, in September, 1905, to survey and assist defendant's grantors in locating their mines and running lines and establishing monuments. He was there for ten days so engaged. His attention was called to the bars mentioned by Madeira and a cabin east of the outcroppings where Madeira testified he posted a notice on a picket fence. He testified that he was at these points and saw no notices. "Q. Did you cover the territory carefully around that deposit? A. Yes, sir, very carefully. Q. Did you cover the territory that could be described by a parallelogram 1500 feet long, the center line running southeasterly and northwesterly from the outcrop 300 feet on each side? A. Yes, sir, I did. Q. Did you find at or near any of the corners of such a figure or at the center line any monument or remains of a monument of any kind? A. Well, only one monument in the creek on the lode line, which had been very recently established there, . . . on the southerly end of the lode." It was shown that this monument was not one made by Madeira. "Q. Mr. Bradley, did you discover any evidence that a line had been run north or northeasterly from the outcrops? A. None at all; no blazed line; no brush cut out." Other witnesses, who had formed part of the surveying party, gave similar testimony. Witness Arnold, one of the locators of defendants' mines in conflict with the Madeira mine, in the last part of August, 1905, went to the located ground with his partners, Davis and Woods, and with them was Mr. Cooper, state mineralogist. Their particular object was to "expert this land for oil"; the party was there two days. He testified: "We were examining the veins that were shown on the

ground and also looking to see whether it had been located recently.'' When asked if he saw ''any location notice or stakes upon or in the neighborhood of that ground,'' he answered, ''We did not.'' Asked what investigation they made, he answered: ''We were traveling on the ground in a radius of perhaps 700 or 800 feet hunting for corners, markings or anything that would indicate a location that had been made there recently.'' He saw old markings on trees, weather beaten, old blazes, but no evidences of recent markings. His attention was called to particular points mentioned by the witnesses for plaintiffs and testified that he saw no notices. Plaintiffs introduced witnesses who testified that, in the month of May and in the early part of July, 1905, they saw the notice posted on the juniper tree at the bars testified to by Madeira and also on the picket fence. Witness Riley testified for plaintiffs. He was employed to make the resurvey and relocation of the Madeira mine, in June, 1906. After describing his work, which was only to establish the corners, he was asked: ''Q. What did you see there at or near any of those corners? A. On the north lode line there was a small tree that had been broken off, a dead tree, and there were two or three stones around the bottom of it''—that was 98 feet from the lode line and 364 feet from where he established the northwest corner. There were no marks on that tree. ''On the northeast corner there were a few scattered stones, looked as though they had been piled, some monument''—(interrupted). That was 45 feet from where he established the northeast corner. ''Down the creek some distance . . . there was a tree standing there with some nails in it . . . that was 276 feet from the southwest corner.'' On cross-examination his attention was called to the fence and cabin near where Madeira claimed to have posted a notice. He testified: ''There was a fence but no corner there, no monument.'' He testified that this point was 283 feet from the southeast corner as he established it. He found nothing at this latter point and ''nothing in that neighborhood that would indicate a mining claim.'' He testified that he found no markings of any kind at the southwest corner nor within 100 feet radius. At the newly located northeast corner he saw nothing, but at a point 145 feet from there, pointed out to him by Madeira, he ''found some loose stones which appeared as having been a stone

mound at one time. There were different mounds around there in places, there had been I suppose some old locations or something. I noticed some mounds down below there on the creek. I don't know what they were there for.''

Section 2320 of the Revised Statutes of the United States provides that ''no claim shall exceed more than three hundred feet on each side of the middle of the vein at the surface.'' [U. S. Comp. Stats., 1901, p. 1424, 5 Fed. Stats. Ann. p. 8.]

It does not follow that the location is invalid where the locator includes within the boundaries of his claim more than the law permits. ''He is entitled nevertheless to hold to the limit which the law authorizes within the limits laid out, and only the territory embraced within the boundaries which is in excess of these limits is to be rejected.'' (*McElligott* v. *Krogh*, 151 Cal. 126, [90 Pac. 823].) This rule presupposes a location which ''injures no one at the time it is made, and where it has been made in good faith.'' (Lindley on Mines, sec. 362.) The mere fact, then, that, in establishing his exterior boundaries, the locator has marked out too great a quantity of land does not necessarily invalidate his location. Where, however, the locator relies upon the corners he has established or has attempted to mark as *indicia* of the location of the lode or ledge, a different question may arise and a different rule may govern. If the courses are so widely separated from where they ought to be as to bear no apparent relation to the lode, i. e., are so remote as to justify a reasonable inference by one seeing the corners that they were not intended to apply to the lode in question, they would add little if any force to the claim that the law had been complied with. And this would be especially true if the notice once posted at the discovery point had disappeared or the lode line was not distinctly marked. ''If the preliminary notice is wanting there would be nothing to guide the subsequent locator, and the excessive location should be held worthless for any purpose.'' (*Ledoux* v. *Forester*, 94 Fed. 600.)

A subsequent locator coming on the ground and finding an uncertain marking of the discovery point and lode line and yet sufficient to arouse inquiry and require examination for exterior boundaries, would not be required to go much if any beyond the lateral limits to look for corners or other markings of the boundaries; and certainly he would not be charged with

notice where the markings of the corners were so far from where they properly belonged; so obscure and lacking in permanency as in the present instance; and in a country densely covered with chaparral; and where the corners were not indicated by blazing of trees or cutting out of brush or otherwise marking their location.

An instructive opinion by Judge Hanford is found in *Ledoux* v. *Forester*, 94 Fed. 600, where the requirements of the statute are stated and the suggestions last above made are given significance. It was there said: "Where the country is broken and the view from one corner to the other is obstructed by intervening gulches and timber and brush, it is necessary to blaze the trees along the lines, or cut away the brush and set more stakes at such distances that they may be seen from one to another, or dig the ground up in a way to indicate the lines so that the boundaries may be readily traced. The least that can be required of locators is that the corner stakes shall not be so far apart as to include an area considerably greater than the size of the claim as described in the posted notice, or greater than the law allows to be included in a single claim. I admit the rule that a location which is made in other respects in conformity to law, but which is greater in length or width than the law permits to be taken in one claim, is not for a mere error in that respect, void, except as to the excess; but when, as in this case, the validity of the location is disputed for alleged failure to fulfill the requirements of the law with reference to marking the claim upon the ground, so that the boundaries can be readily traced, the length of the lines and the distance between stakes must be taken into account in connection with the other facts proved, for the purpose of determining this question. It is obvious that if a person, measuring from the stakes at one end of the claim, the required distance in the direction indicated by the notice of location does not find the other end stakes, nor anything else to guide him to where the stakes may be found, he may reasonably conclude that such corner stakes have not been set and that the location is void. In such a case the excessive distance between the corner stakes is misleading and a locator who has committed such an error has failed to comply with the law."

The cases which protect the locator where he exceeds the legal lateral limits, are cases where he has marked his point of discovery and lode line and has made what would otherwise be required in making a valid location under section 2324 of the United States Statutes [U. S. Comp. Stats. 1901, p. 1426, 5 Fed. Stats. Ann. p. 19], which provides that: "The location must be distinctly marked on the ground so that its boundaries can be readily traced." And this brings us to the question chiefly argued in the briefs: Was the location so distinctly marked as that its boundaries could be readily traced?

In *Gleeson* v. *Martin White M. Co.*, 13 Nev. 442, cited by both parties, will be found an illuminating discussion of the mining law. Beatty, J., speaking for the court, said: "One of the imperative requirements of the statute, an indispensable condition precedent of a valid location, is that it shall be 'distinctly marked on the ground so that the boundaries can be readily traced.'" Quoting from *Golden Fleece Company* v. *Cable Con. Co.*, 12 Nev. 312, he said: "It is true that the vein is the principal thing and that the surface is but an incident thereto; but it is also true that the mining law has provided no means of locating a vein except by defining a surface claim, including the croppings, or point at which the vein is exposed, and the part of the vein located is determined by reference to the lines of the surface claim." Again: "How soon after the discovery of the vein 'the location must be distinctly marked on the ground so that its boundaries can be readily traced' (Rev. Stats., sec. 2324), [U. S. Comp. Stats. 1901, p. 1426, 5 Fed. Stats. Ann. p. 19], we do not decide, but until it is so marked we are clear that the location is not complete, and the law has not been complied with." The opinion points out that the object of the law in requiring the location to be marked on the ground is "to fix the claim, to prevent floating and swinging, so that those who in good faith are looking for unoccupied ground in the vicinity of previous locations may be enabled to ascertain exactly what has been appropriated in order to make their locations upon the residue." It is further shown that the statute does not in terms require the *boundaries* to be marked but requires the "*location* to be so marked that its boundaries can be readily traced." The learned justice adds: "It would be safer and therefore better to comply with the recommendation of the

land-office and erect stakes at the corners of the claim, but if the grand object of the law is attained by the marking of a center line we can see no reason why it should not be allowed to be sufficient." This rule is not everywhere accepted nor do we think it necessary in the instant case to express a definite opinion upon it. If the rule in the Gleeson case may be applied we must always remember what were the facts. The Paymaster claim, the one giving rise to the rule, was marked "by means of the two stakes at the ends of the claim on the line of the croppings and by the location monument at the point of discovery." Furthermore, said the court, "it is to be observed that there is no question that the locators of the Paymaster were the original discoverers of the ledge in controversy; that their claim was notorious; that they and their successors have continued to occupy and develop the property; that the Shark locators were aware of the priority of the Paymaster claim." Such were the facts in view of which it was held that the location was sufficiently marked on the ground. The facts in the present case differ widely and radically from the facts in the Gleeson case insofar as the markings of the center line are concerned. Assuming all that Madeira testified to be true, what did he do? We quote from the opinion of the trial judge:

"George Madeira testified that he had long been familiar with the ledge of magnesite at this point, and that on April 12, 1905, he visited it for the express purpose of locating a mine on it. That on this date the ledge was vacant and showed no signs of ever having been worked. That on this day he posted three notices and monuments on the claim as follows: The first notice was placed at the point of discovery, about fifteen feet from the end of the ledge on the south bank of Austin Creek, and he built a monument of rock around the base of the tree upon which the notice was posted. The second notice was tacked on a board, which board was nailed on a juniper cedar tree at a place where there was a pair of bars, near the trail running beside the creek; this was at the southwest corner of the claim. The third notice was posted by nailing it on a fence and making a mound of earth and placing a picket in it. This was the southeast corner of the claim. A copy of these notices, which were all alike, was recorded by him in book G of Promiscuous Records at page

332, of Sonoma County Records, April 15, 1905. He then stepped off what he thought was fifteen hundred feet along the trail on the right bank of the creek, but what was in reality two hundred feet or more than the fifteen hundred feet, and built a monument of rock and placed a picket in it. This was the northeast corner of the claim. He then stepped off what he thought was three hundred feet to the west and built a large stone monument in a little gulch and placed a stake in it, but did not post any notices. This was the north center line of the claim. He then stepped what he thought was three hundred feet west of this and found a small dry tree, three or four inches in diameter, the top of which he broke off, and dug a small mound of earth and piled some small rocks around the base of the tree. This was the northwest corner of the claim.''

No notice was posted at the south and center. Only the point of discovery and the north and center were thus marked and these two points were nearly the entire length of the claim apart. There were no blazings or other markings of the center line; the country was rough and brushy and neither end of the claim was visible from the other. It is obvious that the Gleeson case gives no support to the claim that the center line was sufficiently marked to bring it within the requirements of the statute.

Madeira's resurvey and relocation, made in June, 1906, is convincing evidence that he did not regard his claim as distinctly marked on the ground. At best his location was only such as would have entitled him within a reasonable time after discovery to mark his boundaries, either by definitely marking his center line, as was done in the Gleeson case, or both by marking that line and his exterior boundaries, before conflicting rights accrued. (Lindley on Mines, sec. 373.) He knew that defendant's grantors had located the ground and were at work on it in September, 1905. The evidence is that they performed a large amount of labor on the mine, that their possession was unbroken from the date of their location; their good faith is not seriously questioned; there is no evidence that they knew of Madeira's location when they made their location, or until in October, unless imparted constructively by the recorded notice, which cannot be said to give notice for it does not identify the lode. With this knowledge on his

part and this ignorance on their part, Madeira made no further attempt to mark his location on the ground until in March, 1906. This we do not think was within a reasonable time under the circumstances.

Upon the sufficiency of the steps taken by Madeira to make a location, we content ourselves with the view expressed by the learned trial judge. We quote: "And the marking upon the ground should be made so certain and so plain that any one prospecting in the same locality would have no trouble in locating the exact ground claimed. Measured by the above rule, was the marking of the claim by Madeira sufficient? This statute (Rev. Stats., sec. 2324) [U. S. Comp. Stats. 1901, p. 1426, 5 Fed. Stats. Ann. p. 19], does not require that a notice shall be recorded. Nor does it require that a notice shall be posted on the claim. It leaves these matters to the regulations of the local laws. The local laws generally require that a notice shall be posted, and even in the absence of such a requirement, it would be a very proper aid to the description. But the statute does not require it. (*Carter* v. *Bacigalupi*, 83 Cal. 188, [23 Pac. 361].) It is conceded in this action that there are no local mining laws governing the location of the claim in dispute.

"All of the authorities agree that any marking by which the location may be readily traced is sufficient. I think that the following citations state the law:

" 'All of the authorities agree that any markings on the ground by stakes, monuments, mounds, and written notices whereby the boundaries can be readily traced is sufficient": (*Book* v. *Justice Min. Co.*, 58 Fed. 113, and cases cited.)

" 'If a third party intending to locate can readily ascertain from what has been done by the prior locator, the extent and boundaries of the claim so located, then the object of the statute has been accomplished.' (*Kern Oil Co.* v. *Crawford*, 143 Cal. 302, [3 L. R. A, (N. S.) 993, 76 Pac. 1112].)

"Applying the above rule to the four corners as located by Madeira, I do not think that it can be said that any of them come within the rule. His southwest corner was a copy of the notice tacked on a board and nailed on a juniper tree 276 feet beyond the point where it should have been located. This notice, after describing the lode, called for 'corner stakes and monuments on each corner.' This posting of a notice without

a monument could not be said to be sufficient to notify a third party who was seeking to locate, that this was his corner. His southeast corner was made by nailing his notice on a picket fence, and with his geological pick he 'made a mound of earth and put a picket from a fence in it.' This was at a point 283 feet beyond where it should have been. There is no testimony as to whether this mound was six inches or six feet high. If it had been high enough to keep the picket from falling over of its own weight, it would have taken years of erosion to obliterate it, yet there is no evidence that any one ever saw it again.

"And a notice nailed on a picket fence would in all probability not last long in the mountains. His northeast corner was made by building a monument of rock and placing a stake in it. The stake was not driven in the ground, nor was the size of the monument given. This was 145 feet north of where it should have been located, in a country that was 'extremely broken and rough and covered densely with chaparral' (Madeira's testimony). And there were other monuments near by (Riley's testimony). His northwest corner was made by breaking off the top of a small dead tree three or four inches in diameter and digging a mound of earth with his pick, and piling some small boulders about the base of the tree. This was 364 feet north of where his corner should have been on the west side of his claim, which, according to his testimony, was practically impassable, and he made no effort to get through it.

"While the law is as has been quoted, that where a locator has by mistake in good faith laid off more land in his claim than he was entitled to, that it is void for the excess only, I do no think that it can be held that monuments of as temporary a character as Madeira testified that he built, in an extremely broken and rough country densely covered with brush and at points so far away from where the real corners should have been placed, where there were a good many other monuments of like character, with nothing to identify them as corners of this particular claim, can be said to come within the rule as above laid down, as being sufficient to notify third parties of what has been done by prior locators. There has been but one exception made to this rule. But that was where the prior locators had done work on the claim, and the junior

locators knew the extent and boundaries of the claim, and relied on the errors of the location in an attempt to oust the senior locator. The courts have properly held that having had the knowledge of the location, they were not harmed and could not be held to come within the rule."

In their brief, appellants call attention to the errors of law alleged to have been committed in the admission or rejection of evidence. The brief states that "the court erred in permitting the witness," etc., or "the court erred in permitting the witness to answer the following question," citing page of transcript. The alleged errors are not argued, counsel merely calling attention to the exceptions reserved by the plaintiffs at certain folios of the transcript. A point so presented to this court will not be considered. (*Pigeon* v. *Fuller*, 156 Cal. 691, 702, [105 Pac. 976].)

The judgment is affirmed.

Hart, J., and Burnett, J., concurred.