[Civ. No. 2074.   Fourth Appellate District.—July 21, 1938.]

MARTIN DEL GIORGIO et al., Appellants, v. MARY L. POWERS, Respondent.

Sloane & Steiner for Appellants.

M. W. Conkling and Harry W. Horton for Respondent.

HAINES, J., *pro tem.*—This is an action brought by plaintiffs and appellants, Martin Del Giorgio and V. J. Russo, against defendant and respondent, Mary L. Powers, as well as a corporation known as Crystal Quartz, Inc., and various fictitiously named defendants, to quiet title to an unpatented mining claim in San Diego County known as the "Patten" mining claim and also known as the "Old Doctor Northrup" mining claim, as more particularly described in a location notice recorded in the recorder's office of said county by one F. G. Patten on November 13, 1925. Neither Crystal Quartz, Inc., nor the fictitiously named defendants have been served or appeared in the action. The court found that the plaintiffs are not the owners of the property involved but abandoned the same in March, 1931, or thereabouts, and by its judgment denied them all relief. From this judgment the present appeal is taken.

No evidence was introduced with respect to the actual location or marking upon the ground by Patten of the boundaries of the claim, the only showing with respect to his location of it being the recorded location notice which was produced. Patten, on November 15, 1927, deeded the prop-

erty to appellant Russo and one Stull. There is in evidence a typewritten document purporting to have been signed on January 6, 1928, between appellant Russo and said Stull, on the one hand, and one Hardesty and respondent Mary L. Powers, signing herself, M. L. Powers, on the other, in words and figures following:

"San Diego, Calif., Jan. 6th, 1928.

"We the Undersigned agree to take in Mr. Hardesty and Mrs. Powers as Our Partner on our Cilica Mines, The Old Doctor Northrup claim.

"We are taking them in on Fifty-Fifty basis on all mineral and non metalic mineral or any thing of value found on said Property.

" (Signed)

"RALPH A. STULL

"V. J. RUSSO

"FRANCES F. HARDESTY

"M. L. POWERS."

Mrs. Powers' testimony is that, while all four were together interested, Russo, Stull and Hardesty personally worked on either the mining claim or the roadway to it, while she furnished them with provisions; also that during that spring (1928) Hardesty and she spent in connection with the work more than $800 for food, equipment and dynamite. She testified also that she and Hardesty took quartz from the mine to Los Angeles and elsewhere and tried to work up a demand for it.

On May 24, 1928, Russo and Stull, with their wives, executed a deed purporting to convey the entire property to appellant Del Giorgio. This deed makes no mention of Hardesty or Mrs. Powers or of any interest on the part of either in the property. Two days later Del Giorgio reconveyed what purported to be a half interest in the claim to Russo. The writing of January 6, 1928, above set out, was not recorded and there was, therefore, no record to supply constructive notice of its existence. Del Giorgio, however, testified to having talked in Russo's company with Hardesty and Mrs. Powers at the home of the latter three or four days before his purchase, at which time he says that Hardesty asserted his interest in "the quartz of the mining property". Hardesty was discussing the marketability of the ore and his effort to sell it. Del Giorgio claims not to have seen the

actual contract (that is, the writing of January 6, 1928) nor to have known anything about its contents "except what Mr. Russo said about they had some kind of a contract about the ore". He says that Russo told him with respect to Hardesty and Mrs. Powers that "they ain't got no interest in the property; the only contract they had was one for the mining part—the only contract". Del Giorgio adds that "he didn't say what it had on it". Russo also testified to a conversation with Hardesty and Mrs. Powers which he placed "a little after May, 1928" at which Del Giorgio was present and in which Russo claims to have said that he and Stull were selling the mine to Del Giorgio, on which occasion he claims that neither Hardesty nor Mrs. Powers mentioned having any interest in the property. If this testimony is intended to relate to the same conversation referred to by Del Giorgio the latter's conception of its time is different from Russo's, for Russo says that Del Giorgio had "already bought the mine". Mrs. Powers, on the other hand, testified to a conversation with Del Giorgio, the exact date of which she did not place. She says that Russo brought Del Giorgio to her house and the two stayed overnight, Hardesty being present; that Russo told them that he wanted to sell his interest to Del Giorgio. She says that she did not know that the actual transfer had taken place "until Mr. Ussher and I went over the books; I think Mr. Russo's book". On December 27, 1928, Hardesty deeded any interest that he may have acquired in the claim to Mrs. Powers and thereafter died.

Mrs. Powers says that in the year 1931 she spent $108 in doing assessment work on the property. No affidavit of the performance of work for the year ending on June 30th of that calendar year seems to have been filed, Mrs. Powers apparently claiming that she relied on one Ussher's promise, made under circumstances presently to be referred to, to do it for her. She relates a conversation between herself and Del Giorgio in March or April, 1931, at which time she says that he came to her house, as follows:

"I asked him whether he was going to do any more assessment work on it, and he said, 'Well, I have never taken a dollar out of the mine. I am not going to spend any money on it.' I says, 'What are you going to do about it? You will have to do the assessment work.' And he said no, he

wasn't going to do any more assessment work or have anything to do with it again. He says, 'You may do as you like. I don't want anything more to do with it, as far as I am concerned; you can have my whole interest in the mine.' "

The semicolon in the middle of the last sentence is obviously that of the court reporter and need not be regarded in construing what was said.

For several fiscal years subsequent to the one which ended with June 30, 1931, Mrs. Powers posted on the property and caused to be recorded, notices of her intention to hold the claim under the federal moratorium legislation. According to her testimony she, in 1935, posted on the center monument on the property, the corners of which were already marked by other monuments, and also recorded, a relocation notice, a copy of which is in the record, containing, among other statements and recitals, one to the effect that: "This location is made on account of an abandonment by co-owner Del Giorgio for failure to file notice of intention to hold during the fiscal years ending July 1, 1932, 1933 and 1934." As against Mrs. Powers' account of the matter, Del Giorgio in his testimony denied that he ever told her that he was abandoning his interest in the claim or that he was leaving it to her. On the contrary, he testified that in 1931 he was short of money but caused the Ussher above mentioned to relocate the claim *for him,* and that, in that year and thereafter, he left the matter of performing the assessment work wholly to Ussher.

Ussher's relation to the situation has been, according to the evidence, somewhat peculiar. Mrs. Powers testified that originally she had some negotiations with him about handling a ranch which she owned; that she had at her home some specimens of feldspar which led to their discussing this mine; that Ussher got her to take him to see it and also brought other people to see her in connection with it, including one Gus Holmes. She took Ussher to see the mine several different times. He helped her rebuild the monuments on it. She testified that she employed Ussher on a fifty-fifty basis to work the mine for her, but it appearing that the arrangement was in writing and the writing not having been produced, her testimony to that effect was stricken out. However, on being recalled she was allowed to testify that Ussher took out quartz for her in the summer of 1931. Notwith-

standing such arrangements as he may have had with Mrs. Powers, Ussher undertook on July 1, 1931, to relocate the mine, posting a location notice in the names of Gus S. Holmes and himself, and he and Holmes afterward signed and swore to notices, under the federal moratorium statutes of intention, in their own behalves, to hold this claim for each of the respective fiscal years ending with June 30, 1933, and June 30, 1934 (referred to in their affidavit as July 1st of each of said years). There is nothing said either in the Ussher-Holmes location notice, nor in these affidavits of intention to hold, about any connection on the part of either Mrs. Powers or of Del Giorgio or of anyone, other than Holmes and Ussher, with the property. The evidence further shows that in the fall of 1934 the present respondent, Mary L. Powers, brought an action numbered 79,266 in the Superior Court of San Diego County against Holmes, Ussher, one Frank Alonzo and Crystal Quartz, Inc. (to which corporation Holmes and Ussher had meanwhile undertaken to deed the property), to quiet her title to the same as against them; that the present appellant, Del Giorgio, was brought in as a party to the action by court order and impleaded by a cross-complaint filed by Crystal Quartz, Inc., to quiet title against him, to which cross-complaint Del Giorgio filed an answer claiming to be the owner of the property. The said action 79,266 was dismissed as to Holmes, but tried as to the other parties affected by it upon the issues joined and resulted in a judgment on June 26, 1935, in favor of Mrs. Powers as against Ussher, Alonzo and Crystal Quartz, Inc., quieting her title to the property as against them, decreeing that the latter take nothing by its cross-complaint against Del Giorgio, but adjudicating nothing as between Mrs. Powers and Del Giorgio, as between whom, indeed, there were no pleadings on file. It appears that Del Giorgio filed an appeal from this judgment to this court and Crystal Quartz, Inc., filed an appeal to the Supreme Court. We have no record of any further proceedings on Del Giorgio's said appeal to this court, nor does the record in the instant case show what disposition, if any, has been made of the appeal of Crystal Quartz, Inc., to the Supreme Court.

Mrs. Powers testified that during the trial in the superior court of said case 79,266 Del Giorgio stated to her: "I don't know why they called me, because I haven't anything to do

with this since I gave it all to you." A Mrs. Bliss, who was with Mrs. Powers at the time, corroborates her account of this conversation, but Del Giorgio denies ever seeing Mrs. Bliss and denies that he said anything of the sort.

For the purpose of impeaching Mrs. Powers' testimony John R. Lester and Stanley M. Gue, deputy labor commissioners, were called on appellant's part. It appears from their testimony that two laborers who had worked on the mine in June, 1931, filed claims against Mrs. Powers for failing to pay them for their work; that she appeared in August and at that time stated that she, Ussher and Del Giorgio were engaged "in some kind of a partnership in this mining property" and agreed to pay the claims within 30 days, but that, having failed to do so, she came into their office again and signed an order, a copy of which was produced, directed to Del Giorgio and Ussher, asking them to pay to Gue $70.47, the aggregate of these claims and "deduct from any settlement with me later". This order is dated September 22, 1931, and recites that: "The undersigned" (Mary L. Powers) "and Charles E. Ussher and Martin Del Giorgio are interested as joint venturers" in the claim. Gue says that Mrs. Powers told him that she, Del Giorgio and Ussher had hired these workmen; that Ussher was going to advance the money to complete the assessment work and she was unable at the time to pay the claims but that Ussher and Del Giorgio were both able to pay. Gue says that he put into this order substantially what she told him was the situation. Mrs. Powers claims that she told Lester that Del Giorgio had been interested in the mine but "had turned his interest over to me"; that Lester's reply was that "he ought to come in here; if he wants to hold his interest he will have to come and pay this". Her reply, she says, was: "Well then, it is up to you; make him do so." She claims that she later signed the order directed to Del Giorgio and Ussher in fear of arrest if she did not do so. She also claims that both Del Giorgio and Ussher owed her money at the time. As a matter of fact, neither Del Giorgio nor Ussher paid the labor claims but Mrs. Powers eventually paid them herself.

The evidence does not disclose any claim that appellant Russo ever stated to respondent or anyone else that he had abandoned his interest in the mine, though there is nothing to show any activity on his part in connection with it subse-

quent to 1930, in which year he claims to have participated in the assessment work. Thereafter, according to his statement he "left it in charge of Mr. Del Giorgio. I left him in charge to make arrangements somehow." As we have seen, Del Giorgio claims to have left the matter to Ussher, who, as we have seen, whatever his obligations may have been, appears to have in fact acted in the interest neither of Mrs. Powers, Russo nor Del Giorgio, but in the interest of himself and Holmes.

The evidence sharply conflicts in respect to the writing of January 6, 1928, between Stull, Russo, Hardesty and Mrs. Powers as to its authenticity in its present form, Stull and Russo claiming that, though they signed something, it was not the document as it is now presented. We shall not discuss the merits of this conflict. The trial court made no specific finding on the subject, but if the authenticity of the writing in its present form be deemed material to respondent's case then the court must be taken to have resolved the conflict on that subject in respondent's favor and its finding is conclusive upon us. (*Estate of Jepson,* 178 Cal. 257 [172 Pac. 1107]; *Castor* v. *Bernstein,* 2 Cal. App. 703 [84 Pac. 244]; *People* v. *Driggs,* 14 Cal. App. 507 [112 Pac. 577].)

Appellants contend that even if this writing of January 6, 1928, is in its present form genuine, it amounts to no conveyance from Stull and Russo to Hardesty and Mrs. Powers of any interest in the mining claim but is, at the most, a mere arrangement for handling the product; that they, appellants, are still, subject to the paramount title of the government, the sole owners of the property and have never abandoned it; that even if respondent can make good her claim to have become their partner she can have gained no exclusive right to the property since she has taken no action under the provisions of section 1426-O of the Civil Code or of 30 United States Code Annotated, section 28, to divest them of their interests. Respondent, on the other hand, claims that the said writing of January 6, 1928, amounted to a conveyance to Hardesty and herself of a half interest in the mining claim; that Del Giorgio and Russo have abandoned or forfeited their interests; that after such abandonment and her acquisition of Hardesty's rights she relocated the claim and is in consequence of these occurrences now, subject, of course, to the government title, its sole owner. Stull and

appellant Russo on the one hand and respondent on the other have testified to the conversations that preceded the execution of this document (or, according to the two former, the execution of the document that they did sign) and the accounts given by Stull and Russo are, in brief, that Hardesty claimed to have special opportunities for marketing the product of the mine and that respondent was associated with him and that what was intended by the writing was a mere arrangement for handling the product on the basis of allowing Hardesty and Mrs. Powers to sell such product for the mutual benefit of the four and to participate to the extent of a half interest in the profits from such sales, whereas Mrs. Powers says that the plan was "that we should work the mine together and sell the quartz and divide the spoil of it, or whatever you call it, which we did".

We do not think it competent to resort to these conversations for the purpose of construing the writing involved. There is, in our opinion, nothing ambiguous about its terms and that being so it must speak for itself. (Civ. Code, sec. 1639.) ■ We cannot agree with appellant that it is executory. True, its first sentence is to the effect that "We the Undersigned agree to take in Mr. Hardesty and Mrs. Powers as our partners in our cilica mine, the Old Doctor Northrup Claim." So far, the language is possibly not in itself conclusive as to whether the agreement is to become effectual instanter or at some future time, but the finite verb in the next sentence is in the present tense, "we *are* taking them in", etc. This, in our view, makes it entirely clear that the arrangement was to be immediately effective. ■ The next inquiry, however, is what effect it was meant to have. That one effect was the present creation of a partnership between Russo, Stull, Hardesty and Mrs. Powers is obvious, and since, as we view it, the writing involves a partnership, not merely confined to the marketing of the ore but in the whole enterprise, it is manifestly not an ordinary partnership that is contemplated but a mining partnership within the meaning of the provisions of the Civil Code affecting mining partnerships, one of which is that "the mining ground owned and worked by partners in mining, whether purchased with partnership funds or not, is partnership property". (Civ. Code, sec. 2515.) On the other hand, we agree with appellants to the extent of not believing the language used apt to

convey to Hardesty and Mrs. Powers actual legal title to the half interest which they as partners were to have in the mining claim. We do not think its failure to amount to such a conveyance results, as suggested by counsel for appellants, from any want of acknowledgment, or, if such there was, from any failure of immediate delivery of possession; as required by the former legislation of this state (Stats. 1860, p. 175, relating to conveyances of gold mining claims, extended by Stats. 1863, p. 98, to mining claims generally) for, in our opinion, this legislation was superseded by the enactment of section 1091 of the Civil Code. (See 17 Cal. Jur. 405.) ■■■ A mining claim is real estate (*Harris* v. *Kellogg*, 117 Cal. 484, 488 [49 Pac. 708]; *Contreras* v. *Merck*, 131 Cal. 211, 214 [63 Pac. 336]), and may therefore be conveyed as in the case of other real estate. This writing, however, neither contains the word ''grant'' nor any language which purports to be a transfer of legal title. In our view, so far as the title to the mine is concerned, it amounts not to a conveyance but to a declaration of trust, in consequence of which Russo and Stull (assuming them to have been the holders of the legal title subject to the government's paramount right) agreed henceforth to treat the same as the property of the partnership. As such it would appear to be entirely valid under the provisions of section 852, subdivision 1, of the Civil Code. Inartificiality of form will not prevent an instrument from being construed as a declaration of trust. (*Luco* v. *De Toro*, 91 Cal. 405, 417 [18 Pac. 866, 27 Pac. 1082]; *Taber* v. *Bailey*, 22 Cal. App. 617, 620 [135 Pac. 975].) Neither is it necessary that the words ''trust'' or ''trustee'' be used. (*Taber* v. *Bailey*, *supra*, 620.) In our view, then, the effect of the writing was to immediately invest Hardesty and Mrs. Powers with the equitable but not the legal title to a half interest in whatever rights Stull and Russo theretofore had gotten from Patten in the claim.

Taking it, then, as established that beginning with January 6, 1928, Russo, Stull, Hardesty and Mrs. Powers were mining partners and in equity coowners of whatever rights Patten may originally have had in the property, we proceed to discuss the legal effect of its subsequent history, as already recited. As we have noted, Mrs. Powers' evidence is that for a time all four participated in doing work for the benefit of the enterprise. In the following May, however, as we saw,

Russo and Stull, with their wives, deeded the property to Del Giorgio and Del Giorgio redeeded a half interest to Russo.

While we do not know precisely what was the trial court's view of this phase of the matter, the evidence is, in our opinion, sufficient to have justified it in believing that Del Giorgio had, at and before the time of his purchase, actual notice of sufficient facts relating to the connection of Hardesty and Mrs. Powers with the mine to put a prudent man upon inquiry as to precisely what their rights were, and that had he pursued such inquiry he would have learned the terms of the writing of January 6, 1928. In these circumstances he is charged with notice of its execution and contents. (Civ. Code, sec. 19.) It follows that the transaction between Russo, Stull and Del Giorgio in no way affected the rights of Hardesty and Mrs. Powers, but, assuming the original location by Patten to have been valid, left the equitable title to the mining claim vested in a mining partnership which had now come to consist of Russo, Del Giorgio, Hardesty and Mrs. Powers, wherein each had an equal one-fourth interest. Hardesty's subsequent deed to Mrs. Powers resulted in enlarging her interest to a one-half. No essential change in the situation seems to have occurred from that time on until 1931, in March of which year the trial court finds that Russo and Del Giorgio abandoned their interests in the claim.

We have then to consider what evidence there is in the record to support the trial court's finding of abandonment by Russo and Del Giorgio. As to Russo such evidence, if evidence it be, must consist purely in his failure after 1930 (in which year proof of labor was filed in behalf of Del Giorgio and himself) until the present action was commenced in 1935, to do anything with the property or toward keeping up the assessment work upon it, other than to leave these matters, as he claims to have done, wholly to Del Giorgio. ''To constitute such abandonment there must be a concurrence of act and intent, viz., the act of leaving the premises or property vacant, so that it may be appropriated by the next comer, and the intention of not returning. (*Judson* v. *Malloy,* 40 Cal. 299; *Bell* v. *Bed Rock etc. Co.,* 36 Cal. 214; *Moon* v. *Rollins,* 36 Cal. 333 [95 Am. Dec. 181]; *St. John* v. *Kidd,* 26 Cal. 263; *Richardson* v. *McNulty,* 24 Cal. 339; *Willson* v. *Cleaveland,* 30 Cal. 192.) The mere intention to abandon, if not coupled with yielding up possession or a cessation of user, is

not sufficient; nor will the nonuser alone without an intention to abandon be held to amount to an abandonment. Abandonment is a question of fact to be determined by a jury or the court sitting as such. Yielding up possession and nonuser is evidence of abandonment, and under many circumstances sufficient to warrant the deduction of the ultimate fact of abandonment. But it may be rebutted by any evidence which shows that, notwithstanding such nonuser or want of possession, the owner did not intend to abandon." (*Utt* v. *Frey*, 106 Cal. 392, 397, 398 [39 Pac. 807].)

Cessation of work on a mining claim and absence therefrom is a circumstance, especially if prolonged, affording some evidence of abandonment. (*Depuy* v. *Williams*, 26 Cal. 309, 313; *Bell* v. *Bed Rock etc. Co.*, 36 Cal. 214, 217; *Seymour* v. *Wood*, 53 Cal. 303; see, also, to the same effect as to a miner's ditch, *Integral Quicksilver Min. Co.* v. *Altoona Quicksilver Min. Co.*, 75 Fed. 379; and as to possessory title to public land generally, *Gluckauf* v. *Reed*, 22 Cal. 468.) Neither such cessation, however, nor such absence, though prolonged, necessarily constitutes such abandonment, for there can be no abandonment without an intention to abandon. Thus it was said in *Moon* v. *Rollins*, 36 Cal. 333, 338 [95 Am. Dec. 181], that:

"It is a question of *intention,* and has been so held over and over again, and *not* a question of *time,* except so far as the jury are entitled to consider lapse of time in connection with other circumstances of claim, or non-claim, and acts of ownership and dominion, or a want of such acts, for the purpose of ascertaining the intention."

Although mere disuse without an intention to abandon is no abandonment, these authorities nevertheless recognize that a jury or a court sitting as a jury may properly consider both the disuse and the time of its continuance in deciding what the intention was. It is true, indeed, that relinquishment of a property with intent never to assert any further claim to it requires no lapse of time thereafter to amount to an abandonment. (*Waring* v. *Crow,* 11 Cal. 366; *Trevaskis* v. *Peard,* 111 Cal. 599 [44 Pac. 246].) Manifestly, however, other things being equal, disuse for a long period is more persuasive of intent than disuse for a shorter time. In the instant case we cannot say that Russo's failure for above five years to give any personal attention to the property was no substantial

evidence of his intention to abandon it, even though he now claims that he was relying on Del Giorgio to do what was necessary, which claim the trial court was not, of course, required to believe. In fine, we cannot say that the finding was made without evidence and we are, therefore, not at liberty to disturb it.

As respects abandonment by Del Giorgio the evidence admittedly conflicts. There is no claim that between March, 1931, and the time that this action was begun in 1935 he was at the mine or did any development work on or about it. In these circumstances the trial court, as was its right, evidently believed Mrs. Powers' account of what he had said to her in March, 1931, with such corroboration as is furnished by her further testimony and that of Mrs. Bliss about his subsequent admission while attending the trial in case 79,266. In considering the effect of this we do not, of course, overlook the legal principle already noted in our quotation from *Utt* v. *Frey, supra,* that an abandonment must result in returning that which is abandoned to the public domain and that there is no such thing as an abandonment in favor of another individual. As was said in *Stephens* v. *Mansfield,* 11 Cal. 363, 366:

"Abandonment must be made by the owner, without being pressed by any duty, necessity or utility to himself, but simply because he desires no longer to possess the thing; and further, it must be made without any desire that any other person shall acquire the same; for if it were made for a consideration it would be a sale or barter, and if without consideration, but with an intention that some other person should become the possessor, it would be a gift."

This principle was elaborated in *Richardson* v. *McNulty,* 24 Cal. 339, *supra,* 344, 346, where, after referring to *Stephens* v. *Mansfield, supra,* the court said:

"It is true, as contended by counsel for the appellants, that so far as the case of a gift is concerned, this decision goes outside of the facts; but, upon principle, there is no difference between the act of selling and the act of giving, so far as their effect as evidence upon a question of abandonment is concerned. If the gift be complete—that is to say, if the thing given be delivered, and accepted by the donee, a transfer is the result, which transfer as much precludes the idea of abandonment as a transfer resulting from a sale.

No question of abandonment can arise where a transfer has been had by the act of two parties. To an abandonment of the character involved in this and all similar cases, there can be but one party. The mining ground in controversy, before it was occupied by the plaintiff, so far as the right to mine the same by parties without title is concerned, (and this is true of all the public mineral land of the state), was *publici juris,* and open to the appropriation of anyone desiring it. By the act of occupancy, the plaintiff made it his, and manifested his intention to do so. Once his, it continues his until he manifests his intention to part with it in some manner known to the law. He may sell it or give it to another, or transfer it in any other mode authorized by law, (thereby preserving the continuity of possession), or he may abandon it. In doing the latter he must leave it free to the occupation of the next comer, whoever he may be, without any intention to repossess or reclaim it for himself in any event, and regardless and indifferent as to what may become of it in the future. When this is done, a vacancy in the possession is created, and the land reverts to its former condition, and becomes once more *publici juris,* and then, and not until then, an abandonment has taken place. There can be no abandonment except where the right abates, and ceases to exist. If it be continued in another, by any of the modes known to the law for the transfer of property, there has been no abandonment, for the right, first acquired by the occupancy still exists, although vested in another, and the continuity of possession remains unbroken. But the occupant cannot continue his right in another by the mere act of volition; nor is his right kept alive by a mere desire that it may become vested in a particular person. Such a volition or desire does not amount to a gift, for there can be no gift without an acceptance. If the wish or desire is expressed to the person in whose behalf it is entertained, and thereupon he occupies the land, a gift is the result, and the transfer is made complete—and not otherwise. The mere wishes and desires of the occupant are only effectual to preserve the right in himself, and not to transmit it to another; and the case of *Stephens* v. *Mansfield, supra,* so far as it can be fairly construed to go beyond the views here expressed, is not law.

''From what has been said, it follows that the charge in question, so far as it instructs the jury that there can be

no abandonment where the transaction amounts to a gift, is correct, but that it is erroneous so far as it instructs them that leaving the claim, with a desire that a particular person may acquire it, might be construed as a gift. The error is in the definition of a gift, rather than in that of an abandonment.''

To the same effect see *St. John* v. *Kidd,* 26 Cal. 263, 272, *supra, Morenhaut* v. *Wilson,* 52 Cal. 263, 268, *De Wolfskill* v. *Smith,* 5 Cal. App. 175, 180 [89 Pac. 1001], and *Dresser* v. *Allen,* 25 Cal. App. 124 [142 Pac. 911].

It might, perhaps, in view of these authorities be claimed that the language testified to as having been used by Del Giorgio could not amount to an expression of intention to abandon the claim but what he is really said to have done is to have made a gift of it to Mrs. Powers. Particularly is he quoted by Mrs. Powers and Mrs. Bliss as admitting, at the time case 79,266 was tried that he ''gave'' or had ''turned it over'' to the former. This construction of his language would not be particularly helpful to appellants' claim that Del Giorgio all the time intended to retain his interest in the mine; but, even if insisted on, it would not be by any means the necessary construction of what he is quoted as having originally said. If Mrs. Powers' testimony as to what he actually did say in March, 1931, already quoted by us, is adverted to, it will be seen that this is not the necessary result of it. To say ''you may do as you like'', and ''I do not want anything more to do with it; as far as I am concerned you can have my whole interest in the mine'' evinces no necessary intent to make any gift to her, but can quite as readily be construed as a mere expression of Del Giorgio's intention to relinquish the property and of his indifference as to whether Mrs. Powers did anything with it or not. There is nothing in this attitude inconsistent with abandonment so far as Del Giorgio was concerned, nor would his failure to use nice distinctions of terms at a later time when talking to Mrs. Powers and Mrs. Bliss about what had happened require that the court place a different construction on his earlier language.

If, on the other hand, we turn to Del Giorgio's account, it is true that he has testified that he arranged with Ussher to relocate the claim for him and if the trial court believed that he did in fact arrange for such relocation in the interest

of Russo and himself, such conduct, whatever other legal effect it might or might not have, might at least have some tendency to show that he had not entertained in the preceding March the purpose of abandoning the property, although it would not be conclusive of what his intention at such previous time was. The trial court, however, was under no obligation to believe that Del Giorgio had any such arrangement with Ussher, or to accept his present account of what his intentions were. (*Myers* v. *Spooner*, 55 Cal. 257, 260.) Certainly there was nothing in Ussher's subsequent conduct as disclosed in case 79,266 that would have any tendency to corroborate Del Giorgio's account of this purported arrangement. We do not regard what Mrs. Powers stated to the deputy labor commissioners as of any controlling importance. The trial court probably thought it was a mere expedient on her part to escape the pressure placed upon her to pay the labor claims for the assessment work done in 1931. We cannot say that the circumstance that under such pressure she may have told them an untruth or signed statements that they prepared required the trial court to reject as unbelievable her testimony given before it at the trial of the instant case. How far the court was justified in accepting her account of what Del Giorgio had said to her about his abandonment of the claim was for it to decide. Neither would what she said to the deputy labor commissioners about being a joint venturer with Russo and Del Giorgio in itself shed any light on what the latter's intention was back in March of 1931, either about retaining his interest in the mine or abandoning it, but the utmost effect of what she said to the deputy commissioners or signed at their office would be to cast a certain amount of doubt on the correctness of the testimony given by her in the instant case on the stand about what Del Giorgio had said to her, and if the trial court still chose to believe her account of Del Giorgio's conversation with her it was within its rights in so doing. We think, then, the trial court's finding of an abandonment of the mining claim by Del Giorgio, as well as by Russo, binding upon us.

Treating ourselves, then, as thus bound by the trial court's finding that appellants abandoned this mining claim during or about March, 1931, we must hold that it follows, as a matter of law, that when, in September of 1935, they commenced the present action they had no longer any interest

in the property, and that the trial court must be sustained in so finding. This necessarily disposes of the case since one who seeks to quiet title against another must recover, if at all, on the strength of his own title (*Williams* v. *City of San Pedro et al.,* 153 Cal. 44, 49 [94 Pac. 234]; *Sears* v. *Willard,* 165 Cal. 12, 14 [130 Pac. 869]), and having once, as far as they were concerned, abandoned the mine, appellants could not resuscitate any former rights that they may have had in it for the purpose of prosecuting this action.

We have seen that the abandonment of a mining claim may not be made in favor of another locator, but that if effective at all it is to make the interest abandoned *publici juris.* What the legal effect may be of such abandonment by those who hold the legal title to a mining claim in trust as to an undivided interest with one or more persons who are not parties to the abandonment, and whether or not such cestuy or cestuys retain their original rights, or may, by relocation such as Mrs. Powers has here attempted, reserve, resuscitate, renew or enlarge them to a complete ownership of the claim, are questions which we must leave to be decided when they arise. (See, however, *Strang* v. *Ryan,* 46 Cal. 33.) The trial court's judgment did not undertake to determine what respondent's present rights may be. It merely determined that appellants have none.

The judgment is affirmed.

Barnard, P. J., and Marks, J., concurred.