[Civ. No. 2400. Fourth Appellate District.—December 19, 1939.]

J. LEX BROWN, Appellant, v. T. J. MURPHY, Respondent.

172

L. M. Cox, E. John Eriksson and Homer M. Bail for Appellant.

Duckworth, Harrison & Mussell for Respondent.

GRIFFIN, J.—This is an action to quiet title to certain mining claims in San Bernardino County, described by appellant as the Ledge Group of claims. Defendant and respond-

ent answered and denied plaintiff's title and right of possession; admitted an adverse interest in the property and alleged ownership and right of possession to certain mining claims known as the Gold Chief Group; and prayed for judgment quieting title to the latter group of claims.

Trial was had before the court which resulted in a judgment for defendant and respondent, quieting his title to the Gold Chief Group, and against appellant's claim of title to the Ledge Group of claims. Plaintiff appeals from the judgment.

T. J. Murphy and his predecessors in interest have been the owners and in possession of the Gold Chief Group of mining claims for more than forty years. These claims are situated in the Goffs Mining District and are named as follows: Gold Chief, Gold Chief Number Two, Marie, Ethel, and Gold Chief Number One, the location notices of which were recorded August 30, 1893; August 30, 1893; October 25, 1894; April 2, 1896, and January 9, 1897, in the order named. In the original location notices the Gold Chief was described as the Gold Chief Claim; the Gold Chief Number Two as Gold Chief South Extension Mine; the Marie as Miriam Gold Mine; the Gold Chief Number One as Gold Chief North Extension Placer Mining Claim; and the Ethel as the Ethel Gold Mine. The record title shows various transfers extending over many years, by which T. J. Murphy claims title in addition to adverse possession for the period prescribed by law.

These mining claims are contiguous. Most of the development work for the group was performed on the principal claim, which is the Gold Chief. The main shaft on the Gold Chief is 200 feet in depth and considerable work was done on the 80, 100 and 200-foot levels. On the 200-foot level there is a cross cut about 75 feet in length, and approximately 220 feet of drifting. On the 100-foot level there is a cross cut of 36 feet and approximately 85 feet of drifting. On the 80-foot level, the drift is approximately 119 feet. There is a shaft known as the Du Pont Shaft, 100 feet deep, on the Gold Chief Number Two, and a tent house and tool shop is located on the Gold Chief.

Proofs of labor containing some variance in descriptions were admitted in evidence showing annual labor from 1896

to 1937 in excess of $15,800. A Mr. Seburn was employed by respondent to act as watchman and do the assessment work on these claims since 1910. He lived on the property continuously for two and a half years prior to the trial. For several years past, respondent paid Seburn between $500 and $600 per year for his services in acting as caretaker and doing assessment work. It appears that there was no interference with respondent's long-continued possession of the Gold Chief mines until appellant appeared on the premises. Appellant visited the property in 1921, and again in September, 1936. He had a conversation with respondent's agent, Bagley, in which appellant expressed a desire to lease the Gold Chief property and obtained permission from him to sample the mine. On December 17, 1936, appellant wrote to respondent's agent asking for a lease and notified the agent that he was going to take out several tons of ore to find out the most profitable way to work the mine. Appellant agreed to pay a royalty on ore shipped. He extracted and shipped the ore between December, 1936, and March, 1937, and paid the royalty as agreed. In April, 1937, he removed his tools from the property. Soon thereafter, in a letter to the agent, he asked to continue with his sampling of the mine and again referred to a lease. On May 12, 1937, he wrote to Mr. Seburn asking for a lease. Appellant admitted, both on direct and cross-examination that he never intended to lease the mines. His testimony was as follows: "(By Mr. Mussell): Q. Then, at the date of that letter, in 1936, you were hoping to be able to get a lease on these premises from the Murphy interests? A. No, sir; I never did expect to lease it. Q. Isn't that what you said in this letter? A. I know I did, but I knew the property was open for location, and I just wanted permission to go in and sample it; that is why I did that. Q. Well, didn't you do that for the purpose of leading Mr. Murphy and Mr. Bagley to believe that you were trying to negotiate a lease on these premises? A. I was still asking permission, to save any trouble, so that I could sample the mine, because I didn't want any hard feelings with Mr. Seburn." In August, 1937, appellant returned to the mines and at about 6 o'clock in the evening, attempted to locate four claims, which he calls the Ledge Group, over and on the Gold Chief property, while Mr. Seburn was actually residing on the property. Appellant

admits that he located these Ledge claims on discoveries made by him while on the property sampling and extracting ore under the previous agreements with the agent of respondent. After doing some work on the property, which he called development and location work, in September, 1937, appellant left the claims and soon thereafter commenced this action to quiet title.

On the trial of the issues as presented by the pleadings respondent did not dispute that monuments were erected on the claims as testified by appellant. He admitted that there was no question of fact that the land covered by said mining claims were mineral bearing, and it was stipulated that the common source of title was from the United States Government. Appellant offered proof of his citizenship, of a discovery of a vein or lode bearing mineral of sufficient value to justify its extraction, the setting up of monuments and tracing of boundaries, of performance of necessary and required location work, of the proper posting of notices of location, and the recorded notices as to his said four mining claims. Documentary evidence was admitted, over appellant's objection thereto, in support of respondent's chain of title through mesne conveyances to the claims pleaded in his answer. There exists discrepancies or variations in names of the claims and mining districts in the documents. Respondent presented, over appellant's objection thereto, documents of proof of annual labor in which similar discrepancies exist. These variations and discrepancies were explained in part by the instruments themselves and by the testimony of witnesses. Other than the existence of the Gold Chief shaft, there is no evidence other than the recorded location notices, that artificial monuments marking respondent's claims existed at the time of appellant's attempted location.

The evidence disclosed that the properties had not been actively operated as a mine for several years prior to the commencement of this action; that there was no great amount of machinery or mining equipment left upon the property since it had been operated as a mine; that Seburn had constructed and reconstructed a frame tent house upon the property and acted as watchman and also was employed to do the assessment work upon the claims; that there was a good road leading to the property used by him for ingress and egress and he repaired this road after each rain; that he cut stumps

upon the property for fuel and to clear it; that he dug about the shafts and sampled for good ore; and that practically all of the work was done upon the Gold Chief claim. Seburn testified: "(By Mr. Mussell): Q. How many days did you work in the department of the Gold Chief Group of mines during the period beginning June 30, 1936, and ending July 1, 1937? A. About 90 days. Q. During the period beginning June 30, 1935, and ending July 1, 1936, how many days? A. 90 . . . Q. During those two years was the value of the work that you did on those claims, as improvements to the mine, more than $500? A. Yes, it would amount to more than $500. Q. For each year? A. Yes, sir, for each year."

The court, *inter alia,* made findings that appellant's locations were within the boundaries of the Gold Chief Group; that appellant at the time of his locations well knew the boundaries of respondent's claims; that appellant's locations were not in good faith and were made while appellant was a permittee and licensee of respondent and while appellant was on respondent's claims under agreement with him for the removal of ore from the claims, and that the required assessment work had been done.

Appellant contends now that the following findings of fact and conclusions of law and judgment are unsupported by the evidence: (1) That there is no evidence in the record of the location of any of the mining claims described by the respondent or his predecessors; (2) that the premises located by appellant were within the boundaries of respondent's claims; (3) that appellant was a licensee and permittee of respondent when he located his claims; (4) that appellant did not locate his claims in good faith; (5) that appellant knew the boundaries of respondent's claims; (6) that respondent was the owner of his mining claims by adverse possession, and that he had been in continuous possession thereof for more than ten years; and (7) that respondent's alleged group of claims were marked and staked so that the boundaries could be readily traced.

It is also claimed that the trial court erred in admitting into evidence certain notices of location, deeds and proofs of labor, together with notices of intention to hold claims. It is further argued that proofs of labor cannot be considered *prima facie* evidence of work done on claims to which there is no record title; that the premises located by appellant were

open and unappropriated government land; that respondent not owning the premises could not give a lawful permit to sample same; that respondent did not plead lack of good faith, and therefore this defense was not open to him; and that respondent did not perform his annual assessment work.

Appellant first argues that on the dates on which each claim was originally located, there was no law, either state or federal, which provided for the posting or recording of location notices; that there was no evidence in the record to the effect that the Goffs Mining District rules required such posting and recording; that therefore there was nothing to give any definite legal effect to the posting and recording of the notices of location of any of the five claims; that there-' fore the trial court erred in admitting them into evidence over the objection of the appellant (citing *Daggett* v. *Yreka Min. Co.*, 149 Cal. 357 [86 Pac. 968]); and that they did not constitute in themselves a location or any part of a legal location of the claims and are of no value except as acts *in pais,* and had no law behind them to give them any legal effect and should have been excluded from the evidence; that there were no monuments, stakes, or any means by which the mining property claimed to be owned by respondent in and about the Ledge Group of claims located by appellant, could be identified either as to location or territory embraced. It is argued that when the validity of a mining claim is questioned, the erection of the boundary monuments cannot be presumed to have been done, and there must be positive proof of their erection; that the only competent evidence of the marking of boundaries must be that of witnesses who saw the monuments placed, or who saw them standing after being placed, citing *Guerin* v. *American Smelting & Refining Co.*, (1925) 28 Ariz. 160 [236 Pac. 684]; *McInerny* v. *Allebrand,* 107 Cal. App. 457 [290 Pac. 530]; *Sarnow* v. *Wood,* 130 Cal. App. 568 [20 Pac. (2d) 364]; *Madeira* v. *Sonoma Magnesite Co.,* 20 Cal. App. 719 [130 Pac. 175].

We have examined the cited cases. The facts and circumstances therein related are dissimilar and do not involve the good faith of the locator. In the instant case that question became directly involved and the court made a finding that appellant did not make his location in good faith. Appellant went upon the premises to sample the mine under a false pretense that he intended to enter into a lease with

respondent. He well knew that any rights he had upon the premises were through respondent's right and claim of possession and ownership. In March, 1937, while appellant was on the property and shipping ore, he wrote to respondent's agent referring to "delay in the proceedings of the lease". From the testimony it is unquestionably shown that appellant gained entry to the Gold Chief property by leading respondent and his agents to believe that he, Brown, would lease the claims. Admitting the foregoing statements and letters, Brown stated that he never intended to lease the Gold Chief property. In respect to appellant's explanation of these false statements he said: "Well, I went down there to save trouble . . . " It is admitted that the only discovery made by appellant was during the period he was in possession of the claims under the agreement. The attempted subsequent location by appellant was made about 5 or 6 o'clock in the evening when he well knew the keeper was on the property. The keeper objected and appellant told him he was going to locate them anyway, over his objection. The appellant had previously gained knowledge of the boundaries of the Gold Chief claims. His testimony was in part as follows:

"Q. (By Mr. Mussell): Do you know whether the claims which you located, or allege that you have located, are they up on the Gold Chief claims? A. Well, I know what they said; that is where Mr. Seburn told me that the Gold Chief Group of claims lay; . . . Q. You say you are familiar with this Gold Chief property—these Gold Chief claims? A. No; I know where Mr. Seburn said they were; he told me in brief, —this is where they lay—the neighborhood they lay in."

A drawing on a blackboard by the many witnesses testifying in relation to the claims, the boundaries, and other identifications, was made use of in the trial court. This drawing apparently has been erased. At any rate, a copy thereof is not before us for consideration. The record in relation thereto is confusing and difficult to follow, especially as to the conflict of boundaries. It is apparent from the testimony, however, that appellant attempted to relocate over the Gold Chief and Du Pont shafts, the main workings of the Gold Chief Group.

The appellant had personal knowledge, as well as knowledge, through recordation of the original location notices, of the area and description of the claims therein set out.

(*Yreka Min. & Mill. Co.* v. *Knight,* 133 Cal. 544, 547 [65 Pac. 1091]; sec. 1426p, Civ. Code; *Cheesman* v. *Hart,* 42 Fed. 98; *Vogel* v. *Warsing,* 146 Fed. 949; *McLean* v. *Ladewig,* 2 Cal. App. (2d) 21 [37 Pac. (2d) 502].) The original recorded location notice dated August 23, 1893, provided in part as follows:

"Notice is *hearby* given that the undersigned in Compliance with the requirements of the Mining Act of Congress approved May 10th, 1872 we have this day located and claim 1500 linear feet along the *coarse* of this Lead, Lode or Vein of mineral bearing quarts and 300 feet in width on each side of the *midle* of said Lead, Lode or Vein situated in Goffs Mining District, County of San *bernanena,* State of California and more particularly described as follows, to-wit:

"Commencing at this monument of stone being the center of the Northerly end of claim and upon which this notice is posted thence easterly 300 feet to monument of stone, thence southerly 1500 feet to monument of stone, thence Westerly 300 feet to monument of stone being the center of the southerly end of claim thence westerly 300 feet to monument of stone, thence Easterly 300 feet to place of beginning.

"This claim is situated at the *bace* of the New York Mountain in the Lowe hills on the Southerly side of the *mountan* and about 7 miles northerly from Rock Springs and about 8 or 10 miles westerly from the town of Purdy on *on* the *Rail Road* and 3 or 4 miles southerly from the New York Mines and about 2 miles from the water in Rushon Canyon and shall be known as the Gold Chief Mine."

The other location notices received in evidence contain a similar detailed description. Notices of location by miners are to be liberally construed. (*Carter* v. *Bacigalupi,* 83 Cal. 187 [23 Pac. 361].)

The evidence is sufficient to support the finding that appellant had knowledge of the boundaries of the claims and to support the further finding that appellant, in relocating the same claims, did not act in good faith. It was stated in *Harper* v. *Hill,* 159 Cal. 250 [113 Pac. 162]:

"The object of the law in requiring the location to be marked on the ground is to fix the claim, to prevent floating or swinging, so that those who *in good faith* are looking for unoccupied ground in the vicinity of previous locations may be enabled to ascertain exactly what has been appropriated

in order to make their locations upon the residue.'' (Italics ours.)

In *Miller* v. *Chrisman*, 140 Cal. 440 [73 Pac. 1083, 74 Pac. 444, 98 Am. St. Rep. 63], the rule is stated thus:

''One who thus in good faith makes his location, remains in possession, and with due diligence prosecutes his work toward a discovery, is fully protected against all forms of forcible, fraudulent, surreptitious, or clandestine entries and intrusions upon his possession. Such entry must always be peaceable, open and above board, and made *in good faith* (italics ours), or no right can be founded upon it.'' See, also, *Tweedy* v. *Parsons*, 217 Cal. 447, 450 [19 Pac. (2d) 497]; *Lind* v. *Baker*, 31 Cal. App. (2d) 631 [88 Pac. (2d) 777].)

A person who knows that a mining claim is in the actual possession of another cannot honestly believe that it is vacant and subject to entry and relocation; and the entry under such circumstances cannot be made in good faith unless it is made upon some right or color of right, or claim of legal right to make the entry. Such a claim of right must exist before the entry, to constitute good faith in making the entry. If it does not exist, the entry is made without color of right or color of title, and is an entry in bad faith; for actual possession in another is *prima facie* evidence of title in the possessor, and is protected in the law against lawless invasion without right or color of right, but one who has a title and present right of possession may always take peaceable possession of what he claims to be his own.

The undisputed findings of the court in the instant case are that the respondent was in the actual possession and occupancy of the property after the discovery of mineral thereon. When the appellant, in bad faith, with full knowledge of these facts, and without any right or color of title, ousted the respondent, and although if it may be conceded, which we do not, that the location under which respondent was in possession was invalid or defective, still he was in the actual possession after discovery, which is essential to perfect any mineral location, and which was the only discovery made under any location. The land was not open and unoccupied mineral land which warranted the appellant in the face of such knowledge of respondent's actual possession to invade such possession, oust respondent therefrom, and under such entry

attempt to negotiate a location of the property. On the contrary, an intrusion under such circumstances by appellant, not in good faith, constituted him a naked trespasser who is in no position to raise any issue whatever on the question of title under which respondent held his possession of the property.

It is true, generally speaking, that any competent locator, for the purpose of negotiating a location for himself, may enter upon mineral land of the United States which is not covered by a valid subsisting location, even though it be in the actual possession of another, but still such entry must be peaceable and in good faith. ▉ Good faith confronts any subsequent locator who enters upon the actual possession of a senior locator's land for the purpose of initiating a claim to the same ground, although the senior location be invalid, and when such entry is in bad faith, such intrusion constitutes a naked trespass. (*Little Sespe Consolidated Oil Co.* v. *Bacigalupi,* 167 Cal. 381 [139 Pac. 802]; *Talmadge* v. *St. John,* 129 Cal. 430, 436 [62 Pac. 79]; *Butte & Superior Copper Co.* v. *Clark-Montana Realty Co.,* 249 U. S. 12 [39 Sup. Ct. 231, 63 L. Ed. 447, 458].)

▉ In view of this finding and conclusion it is unnecessary to determine the many other points presented. Inasmuch as appellant must rely on the strength of his own title, under the circumstances here related it was incumbent upon him to prove that he located in good faith, especially when the property was in the actual possession of another. (*Schroder* v. *Aden Gold Min. Co.,* 144 Cal. 628 [78 Pac. 20]; *Chowchilla Farms* v. *Martin,* 219 Cal. 1, 22 [25 Pac. (2d) 435]; *Del Giorgio* v. *Powers,* 27 Cal. App. (2d) 668 [81 Pac. (2d) 1006]; *Hess* v. *Moodey,* 35 Cal. App. (2d) 401 [95 Pac. (2d) 699].)

There appears to be little or no conflict in the evidence as to the assessment work done on the claims prior to 1936. ▉ The evidence as to such work subsequent to July 1, 1936, is conflicting. Copies of the recorded affidavits of proof of annual labor on the claims were received in evidence which is sufficient to sustain the finding of the trial court that the annual assessment work was done in the time and manner and to the extent required by law. (*Pidgeon* v. *Lamb,* 133 Cal. App. 342, 346 [24 Pac. (2d) 206].) The court could have rested its finding that the annual labor for the years in

question was done on the oral testimony in the record, though conflicting, without considering the affidavits. The burden was upon the appellant to prove failure of the respondent to do the required annual work. (*Musser* v. *Fitting*, 26 Cal. App. 746 [148 Pac. 536].) For the reasons expressed, the judgment of the court denying appellant's claim of title was quite proper. The decree quieting title of respondent as against appellant must be sustained.

Judgment affirmed.

Barnard, P. J., and Marks, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after Judgment in the District Court of Appeal, was denied by the Supreme Court on February 15, 1940.