[Civ. No. 4792. Fourth Dist. Dec. 3, 1954.]

C. E. SAMPSON et al., Respondents, v. R. W. PAGE et al., Appellants.

Carl W. Faucett and David H. Baldwin for Appellants.

Curtis, Knauf, Henry & Farrell and Kenyon F. Lee for Respondents.

GRIFFIN, J.—Plaintiffs and respondents C. E. Sampson and Frank W. Royer et al., brought this action in trespass and sought injunctive relief and damages against defendants and appellants R. W. Page, Joe Corio et al., on the theory that they were rightfully in possession of certain placer mining claims under purchase lease from David D. Duncan and wife, owners, running from October 15, 1946, to October 15, 1966, and recorded October 14, 1946; and that the defendants wrongfully filed claims on said mining property and wrongfully hauled away valuable scheelite and gold-bearing ore from the ore dumps located thereon.

Page and Corio, hereinafter referred to as defendants, filed answers denying generally the allegations of the complaint. They admitted they removed approximately 140 tons of ore, but claim they did so under a lawful claim of right by virtue of the fact that the annual assessment work for the year

*1950-1951* had not been done as required by law, and that the mining claims of plaintiffs had been abandoned and were open for filing, and that defendants filed lawful claims thereon on May 14th and June 2d, 1952. Defendants filed a cross-complaint seeking to have their title quieted against plaintiffs. The action against the other named defendants was disposed of prior to trial. After hearing, the court found generally in favor of plaintiffs and against defendants; found that plaintiffs were in actual and lawful possession of the claims and ore dump under a valid lease; that defendants unlawfully entered upon said claims and carried away and/or converted to their own use ore valued at $1,200, and that defendants, in attempting to locate their mining claims, failed to comply with the laws of California and of the United States and that defendants' claims were void and of no effect. Judgment was entered in favor of plaintiffs for $1,200 and a peremptory injunction was granted against defendants from entering said claim and from carrying away ore from the dump.

On this appeal from the judgment it is claimed that the evidence conclusively shows that the ground was open for location at the time and that defendants' location thereon was properly made.

Notwithstanding the answer denying the allegation of plaintiffs' complaint, it was stipulated at the trial that plaintiffs' lessors, the Duncans, by various mesne conveyances, acquired and then owned all of the interests of the original qualified locators; that the ground was at that time open for location and that all the formalities required by law to effect a location by the original locators were performed.

The testimony shows that plaintiffs were in actual possession of the Duncan claims under the lease, with all royalties paid, that the lease was in full force and effect at all times since its execution, and that plaintiffs Sampson and Royer, on October 15, 1946, acquired the tailings dump by bill of sale and were in possession thereof ever since said date, prior to and at the time of its invasion by the defendants. A fully equipped mill was located on one claim and served the adjoining claims here involved. There was a nearby tailings dump containing approximately 500,000 cubic yards, and there were sumps, roads, rights of way, and other facilities used in connection with the operation of the wash plant.

Notices of intention to hold and proofs of labor were filed for the annual assessment years 1937 to 1950, inclusive, by the rightful locators and their assigns, and by Royer and

Sampson after they acquired the Duncan lease. This and other property was leased to one Kollsman, and he agreed therein to perform the annual assessment work commencing July 1, 1950, and ending July 1, 1951, and record a statement of labor performed thereon in behalf of and in the names of the owners of the mining claims. This was done by Kollsman's agent, one E. B. Corbet.

Plaintiff Royer lived within 8 miles of the claim and, from 1946 to the date of trial, was at the property at least twice a week, except in the cold winter months. Plaintiffs had tools and equipment at the plant and two rooms were locked off for their safekeeping. On May 13, 1952, the date of defendants' first attempted location, the mill was not in operation due to the fact that the power lines were stolen in 1951 by some person. The machinery and motors were on the property and were ready for operation if there was power available. No windows were broken in the mill and padlocks were on the doors. Royer was drilling holes in the dump, surveying it and making tests, and had several men employed for that purpose in February, March and April, 1952. He also took samples from various places on the surface and in the cuts and on the outcrop. A sign was conspicuously posted on the property: "Private Property— Keep Off." Royer saw defendant Page on May 17, 1952, at the mill, and Page asked Royer who owned the property and he was told by Royer that he and a syndicate owned it; that they were getting ready to operate it, and that Page said nothing and drove on. Royer testified that at that time he saw no notices of location posted by the defendants; that on May 18, he drove to the mill and found a post in the driveway of the plant with a location notice in a can on a monument, which notice contained Page's and Corio's names written thereon; that he took the notice out and placed his card therein, giving his name and address with the statement that he had taken the notice with him. This notice of location was similar to the one offered in evidence by defendants. On May 30, 1952, Royer testified that he again saw Page planting a location monument about 2,000 feet north of the plant and that he told him he was planting this on located land and for him to "get off." He testified that Page had driven there with his men in a truck loaded with a shovel loader; that Page was told to leave and that Page made no statement at that time that he was claiming the property; that he gave Page his address and that of plaintiff Sampson

and told him if there was any more information he desired to know about the title to come to them and they would talk it over with him; that Page drove to Royer's home and Royer told him they had owned the property for a number of years; had spent a lot of money on it and kept the assessment work up to date and had proof of this and did not propose to have anyone jump those claims. He then testified that on June 9, 1952, he saw defendants at the mill again loading a truck with the shovel loader and that he told them they were stealing ore and ordered them away but they refused to leave; that he saw them again in the same process on June 12, 1952, and defendants were again told of plaintiffs' claimed title thereto, and that on that occasion no ore was taken. It appears that this same process in attempting to take over the property in June, 1952, continued until a court order was obtained in this action. There was testimony that the tailings in the dump would produce about $6.00 per ton in scheelite and $10 in gold.

Defendants contend on this appeal that the work done by Kollsman for the year 1950-1951, as indicated by his proof of labor, consisted principally of payments of salary of engineers who supervised the prospecting; that the work done consisted of taking samples from the surface and shallow borings and making laboratory tests; that such work left no feasible trace of any work performed on the claim by plaintiffs that year; and did not contribute in any manner to the development of these claims as mining property. (Citing *Golden Giant Mining Co.* v. *Hill*, 27 N.M. 124 [198 P. 276, 14 A.L.R. 1450]; *Fredricks* v. *Klauser*, 52 Ore. 110 [96 P. 679, 682].)

In connection with defendants' alleged locations, they testified that they spent several days around that district and the old mill property; that it looked like an abandoned structure; that they did not go into it and did not see any padlocks on the doors; that they did see a sign on it that someone in Denver leased it and saw no "No Trespassing" signs on it prior to placing the monument or staking their claims, and that they then took samples for assay and went through the records at the county seat and other places and satisfied themselves there were no adverse claims; that they found nothing to indicate any "recent work whatsoever," i. e., within the last five years, but testified that it was difficult to tell because the "desert wind erodes very rapidly" and it is almost impossible to tell after a short period of time whether work is

recent or of ancient origin; that they performed their discovery work; that they made some inquiry around the neighborhood as to who owned the property and were informed that Royer claimed it was patented land; that although he knew where Royer lived, he did not go and see him because he knew it was not patented land. They denied seeing Royer on the property until one month after they started their location work and said that Royer told them they were on patented ground and they were trespassing; that they had knowledge that the ground was not patented and accordingly refused to vacate it. Defendants admitted that they did go to the "county books" and said they found no claim filed in that vicinity by Sampson and Royer, but did find one filed by the Duncans in 1937, and that they investigated further and claimed they found they were not valid claims; that they did find there were some proofs of labor on file and notices of intention to hold, but they did not think they found recorded notices "right up to that date" because *they did not go that far into it*; that if they did see proofs of labor for 1951-1952, they did not recall it; and that they found a record of the lease from the Duncans to plaintiffs.

It is apparent from the testimony offered that defendants knew that plaintiffs were in possession of the Duncan claims, of the tailings dump, mill, water wells and equipment, and laid claim to them at the time they attempted to file their claims and when they were removing ore in trucks, and that they knew they were not acting in good faith when they made the attempted locations.

▮ Good faith confronts any subsequent locator who enters upon the actual possession of a senior locator's land for the purpose of initiating a claim to the same ground. When such entry is in bad faith such intrusion constitutes a naked trespass. (*Brown* v. *Murphy*, 36 Cal.App.2d 171, 181 [97 P.2d 281]; *Ehrhart* v. *Bowling*, 36 Cal.App.2d 503, 508 [97 P.2d 1010]; *Pease* v. *Johnson*, 106 Cal.App.2d 449, 451 [235 P.2d 229].)

▮ It is conceded that plaintiffs filed and recorded, on July 24, 1951, a proof of labor indicating that $3,000 worth of labor and improvements were performed upon these claims between July 1, 1950, and June 1, 1951. A similar proof of labor to the extent of $1,600 was filed and recorded on June 18, 1952, for the year 1951-1952. This was sufficient to support the finding of the court that the annual assessment work was done in the manner and time provided by law.

The burden was upon defendants to prove failure of the plaintiffs to do the required work. (*Brown* v. *Murphy, supra*; *Musser* v. *Fitting*, 26 Cal.App. 746 [148 P. 536].)

In addition to the testimony of plaintiff Royer as to the work he had been doing upon the claims during that period a consulting mining engineer testified that beginning July 1, 1950, he did work upon the property until July 27, 1951; that his work consisted of determining values by panning; that the material was taken from surface concentration and from bore holes made by a screw auger for about 3 feet in depth; that on some claims a post-hole digger was used and the depth was 14 feet; and that a 24-ton jack cable and dump were used for that purpose and concrete was mixed on the premises; that he employed three men at one time and they were "working on the claim"; that he was receiving $2,000 per month for his services and that the work done by him and his men was reasonably in excess of $100 on each claim and that this work was done to facilitate the later development of the property by way of drilling and open pit work. There is additional testimony that in excess of $2,000 was spent on analysis that year. The weight and sufficiency of the evidence, the construction to be put upon it, and the inferences to be drawn therefrom were matters for the trier of facts. (*Bechtold* v. *Bishop & Co., Inc.*, 16 Cal.2d 285, 291 [105 P.2d 984].) Under the prima facie showing made and the testimony produced as to the work performed, the court was justified in finding that the necessary annual assessment work had been performed and that there had not been an abandonment of the claims, or of the tailings or equipment located thereon. (Lindley on Mines, 3d ed., § 629; *Clarke* v. *Mallory*, 22 Cal.App.2d 55, 57 [70 P.2d 664]; *Nevada Exploration & Mining Co.* v. *Spriggs*, 41 Utah 171 [124 P. 770]; *Doherty* v. *Morris*, 17 Colo. 105 [28 P. 85]; *Book* v. *Justice Mining Co.*, 58 F. 106, 113.)

The general rule is that the labor must have been done or the improvements made in good faith, and must be of such a character as directly tends to develop and protect the claim and facilitate the extraction of the metals therefrom. (58 C.J.S., p. 125, § 69.)

It may well be said that the labor and improvements performed upon the property were such as bear a direct relation to the development of the group of claims which tended to facilitate the extraction of ore therefrom, as contemplated by the federal statutes. (*Hough* v. *Hunt*, 138 Cal.

142 [70 P. 1059]; *Galbreath* v. *Simas,* 161 Cal. 303 [119 P. 86]; *Big Three Mining & Milling Co.* v. *Hamilton,* 157 Cal. 130 [107 P. 301]; *Ring* v. *United States Gypsum Co.,* 62 Cal. App. 87 [216 P. 409].)

In view of this determination it is not essential that we determine the question of the sufficiency of the evidence to support the court's finding that defendants failed to comply with the laws in reference to their claimed location. Suffice it to say that the description of the claims contained in the notices were uncertain, vague and indefinite, and there was sufficient evidence to hold that they were void and of no effect. (*Storrs* v. *Belmont Gold Mining & Milling Co.,* 24 Cal.App.2d 551, 557 [76 P.2d 197].) A mere recitation of the description of some of them shows: "Com. at a post at . . . S.W. corner, thence 1200 ft. and thence 1500 E. thence 1200 S. thence 1500 W. to point of beginning." The description begins at a post without making any reference to where the post is located. The claim is attempted to be tied to Trusafe No. 1 but that, like Trusafe No. 2, is not located in any section. Both claims may be anywhere in township 30 South, Range 42 East. It is apparent that the descriptions would not convey to a prospector that a particular tract of ground had been claimed by the locators. The boundaries are not marked. The statement in the notice of the marking merely recites: "Marked as prescribed by law." This does not comply with section 2301 et seq. of the Public Resources Code. It further appears that a question also arises as to whether defendants made adequate discovery work according to the requirements of section 2304 of the Public Resources Code. It might well appear from the evidence produced that the filing of defendants' claims was not made in good faith but was made solely for the purpose of entering the property and appropriating to their own use the ore and tailings which were located upon one of the claims and hauling them to a mill, notwithstanding the fact that these tailings and ore, together with certain described personal property mentioned therein were, by bill of sale duly recorded, assigned to plaintiffs herein for a valuable consideration.

Judgment affirmed.

Barnard, P. J., and Mussell, J., concurred.